70665, 70666. SEMINOLE PEANUT COMPANY
v. GOODSON (two cases).
(335 SE2d 157)

BANKE, Chief Judge.
The appellant, Seminole Peanut Company, is in the business of purchasing peanuts from farmers and other sources and shelling them for resale to commercial users. The appellees, L. R. and Ronnie L. Goodson, are peanut farmers. They filed separate suits against Seminole to recover actual and punitive damages and attorney fees for breach of contract and fraud, based on allegations that Seminole's president, Lee Jones, had induced them to sell Seminole a portion of their 1983 crop by misrepresenting the amount of money they would ultimately receive as consideration for the sale. The two cases were consolidated for trial. The jury found for Seminole on the breach of contract claim but awarded damages and attorney fees to the appellees on the fraud claim. On appeal, Seminole contends that the trial

court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict.

Under federal regulations, part of the appellees' crop was categorized as "quota" peanuts and the remainder as "additional" peanuts. For the year 1983, the appellees were entitled to receive no less than $550 per ton base grade for their quota peanuts and no less than $185 per ton base grade for their "additional" peanuts.

The federal price support program for peanuts is administered in Georgia by an organization known as the Georgia, Florida, Alabama Peanut Association, or "GFA." For the year 1983, the appellees were entitled under federal regulations to deliver to GFA as many "additional" peanuts as they could produce and to receive from GFA an immediate "loan" in the amount of the support price, i.e., $185 per ton base grade. All such "additional" peanuts delivered to GFA were placed in a "pool" and, after the harvest season was over, were sold on a competitive bid basis. After this selling activity was completed, the profits were then divided among the participating farmers on a pro rata basis.

Federal regulations required the appellees either to place their 1983 "additional" peanuts with the GFA for disposition in the above manner or else contract in writing to sell them to an approved handler prior to April 14, 1983. Seminole is an approved handler; and on February 22 and April 13, 1983, the appellees entered into several contracts with it for the sale of their entire 1983 peanut crop. In each case, the price contracted to be paid for the appellees' "additional" peanuts was approximately $250 per ton base grade. However, each contract gave the appellee the additional options at harvest time to "negotiate with the handler [Seminole] a price higher than specified above . . . or place such peanuts [with the GFA] under loan at the additional price support level." Under the option to "negotiate with the handler a price higher than specified above," Seminole offered its own "pool" for additional peanuts. Under this pool arrangement, the farmer received $250 per ton base grade upon delivery and later received a pro rata share of any profit which might be generated upon resale of the peanuts in the pool.

On October 4, 1983, the appellees began harvesting their peanuts and reached the point of having to elect which of the three options to exercise, i.e., deliver their additional peanuts to Seminole at $250 per ton base grade, participate in Seminole's additional peanut pool, or participate in GFA's additional peanut pool. Under both pool arrangements, of course, the crucial factor in determining how much the appellees would ultimately receive was the price ultimately obtained upon the resale of the peanuts in the pool.

It appears without dispute from the evidence introduced at trial that GFA's policy was not to engage in any pre-selling activities for

the disposition of its pool peanuts until after the harvest season was completed, whereas the appellees had heard, and it was in fact the case, that prior to the 1983 harvest season Seminole had already entered into contracts for the sale of a substantial portion of its anticipated inventory. Moreover, there was evidence that as of October 4, 1983, when the appellees were beginning their harvest, a market shortage was anticipated in the industry, with the result that the market price was in the $475 to $500 per ton range and rising. With these factors in mind, the appellees made an initial determination to participate in the GFA's pool rather than Seminole's pool; and on that date, appellee Ronnie L. Goodson, acting for himself and his father, appellee L. R. Goodson, telephoned Seminole's president, Lee Jones, to inform him of their decision.

According to Goodson, Jones sought during this telephone conversation to persuade him to change his mind and go with Seminole's pool, telling him "that with the overhead the GFA had and all the paperwork, the regulations and all they had to go through, that he could beat their prices, that he could tear their prices out of the frame, and that he would guarantee me that he would sell my peanuts for equal to or greater than GFA prices." Goodson further testified that, in response to a direct inquiry on the subject, Jones denied that Seminole had already contracted for the resale of a substantial portion of its pool peanuts, telling him, "[a] few peanuts had been presold, but that it would not be enough to make any difference in the outcome of the price." Goodson maintained that as a result of this conversation, he and his father decided to place all of their "additional" peanuts in Seminole's pool, rather than GFA's pool. Between October 6, 1983, and December 5, 1983, the appellees in fact delivered their entire "additional" peanut crop to Seminole for placement in its pool.

It is undisputed that all of the "additional" peanuts ultimately placed in Seminole's pool were in fact re-sold to other purchasers pursuant to sale contracts which had already been executed prior to October 4, 1983, at an average sale price of $449 per ton base grade. It is also undisputed that in December of 1983, at the close of the harvest season, GFA sold its pool peanuts to commercial purchasers, including Seminole, for an average price of $655 per ton base grade. Based on this price difference, the appellees sought and were awarded actual damages on the fraud count in the combined amount of $102,216.16, representing the difference between the price they were ultimately paid by Seminole and the price they would have received had they exercised their option to participate in the GFA pool. They were also awarded attorney fees in the combined amount of $35,405.39. *Held*:

1. Seminole argues that any promises Jones may have made during the telephone conversation of October 4, 1983, were legally unen-

forceable because they were not in writing and that as such, they may not be considered fraudulent. See generally *Beasley v. Ponder,* 143 Ga. App. 810 (240 SE2d 111) (1977); *Godwin v. City of Bainbridge,* 172 Ga. App. 290 (322 SE2d 733) (1984).

The agreement between the parties was for the sale of goods and was thus governed by the UCC statute of frauds. The term goods, as defined by the UCC, includes "growing crops and other identified things attached to realty . . ." OCGA § 11-2-105 (1). A contract for the sale of a future crop is a contract for the sale of goods within the contemplation of this section, even if the crops have not yet been planted. See *Harris v. Hine,* 232 Ga. 183, 186 (205 SE2d 847) (1974); *R. N. Kelly Cotton Merchant, Inc. v. York,* 379 FSupp. 1075 (M. D. Ga. 1973), aff'd 494 F2d 41 (5th Cir. 1974).

By the express terms of the UCC statute of frauds, a contract need not be in writing to be enforceable with respect to goods "which have been received and accepted." OCGA § 11-2-201 (3) (c). It is undisputed that all of the peanuts at issue in this case were in fact received and accepted by Seminole. Consequently, Seminole is in no position to urge that the parties did not enter into an enforceable sales contract with respect to them. In any event, it is clear that all of the peanuts in question were in fact covered by written sale contracts, whose enforceability was not affected by the uncertainty regarding the price element. "All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. . . . The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery . . . may all be omitted." Official Comment to UCC § 2-201 (1), as set forth in 1 Anderson, Uniform Commercial Code, § 2-201:1, pp. 246-247 (1970 ed.).

2. We reject Seminole's apparent contention that the jury's verdict on the breach of contract claim was inconsistent with its verdict on the fraud claim. It may reasonably be concluded from the evidence that Seminole in fact complied with its contractual obligation, which was to pay the appellees a pro rata share of the proceeds received from the resale of its pool peanuts, but that the appellees would never have agreed to participate in the pool had it not been for Jones' alleged misrepresentations. " 'An independent action in tort based on fraud and deceit arising out of contract is not a suit for the violation of the contract but involves affirmance of the contract and the defrauded party may keep the benefits of the contract and maintain the action for the damages sustained by reason of the fraud.' (Cit.)" *Preiser v. Jim Letts Oldsmobile,* 160 Ga. App. 658, 661 (288 SE2d 219) (1981).

3. Although fraud may not generally be predicated on statements

which are promissory in nature as to future acts or events, it can be predicated on such representations where there is a present intention not to perform or a present knowledge that the future event will not occur. See *Higginbottom v. Thiele Kaolin Co.*, 251 Ga. 148, 152 (304 SE2d 365) (1983); *Marshall v. York*, 165 Ga. App. 795, 798 (3) (302 SE2d 711) (1983). Sufficient evidence of actionable fraud was provided in this case by Goodson's testimony that during his phone conversation with Jones, Jones misrepresented both the extent of Seminole's pre-selling activities and his knowledge of the effect such pre-selling activities would necessarily have on Seminole's ability to match GFA's price in a rising market. As Goodson further testified that he caused both his and his father's peanuts to be delivered to Seminole in reliance upon these representations, and as there is no question that this decision was detrimental to them, we hold that the trial court did not err in denying Seminole's motions for directed verdict and judgment notwithstanding the verdict with respect to the fraud count.

4. Because the evidence was sufficient to support a recovery for fraud, it was also sufficient to support an award of attorney fees pursuant to OCGA § 13-6-11, based on "bad faith in making the contract . . ." See *F. N. Roberts Pest Control Co. v. McDonald*, 132 Ga. App. 257 (208 SE2d 13) (1974); *McMichen v. Martin Burks Chevrolet*, 128 Ga. App. 482 (197 SE2d 395) (1973).

5. Upon careful consideration, the appellees' motion for imposition of a 10 percent penalty pursuant to OCGA § 5-6-6 for filing a frivolous appeal is denied.

*Judgment affirmed. McMurray, P. J., and Benham, J., concur.*

DECIDED SEPTEMBER 16, 1985.

*Bruce W. Kirbo, Kenneth L. Hornsby,* for appellant.
*Ben Kirbo,* for appellees.