## A03A1218. IMEX INTERNATIONAL, INC. v. WIRES ENGINEERING, s.r.j.
## A03A1219. IMEX INTERNATIONAL, INC. v. CO. FI. PLAST, s.a.s.
(583 SE2d 117)

ELDRIDGE, Judge.

In Case No. A03A1218, Imex International, Inc. ordered a machine from the Italian corporation, Wires Engineering, s.r.j. to make diamond wire by coating aircraft cable with polyurethane to cause diamond beads to adhere to the cable. The machine was delivered in January and invoiced to Imex, which did not pay the invoice in full but made a partial payment of the invoice price with no written protest to the invoice price. In January and February, after testing the machine for about 30 days, Imex made a written rejection on July 22, 1999, because Imex contended that the machine did not work as represented and worked like the machines that it already had. Wires brought suit on open account, which Imex answered, raising issues of no agreement as to price, failure of consideration, rejection, and lack of a certificate of authority. Wires moved for summary judgment, which the trial court granted. Finding no error, we affirm.

In Case No. A03A1219, Imex contracted with the Italian corporation Co. Fi. Plast, s.a.s., an affiliate of Wires, to supply it with diamond beads for use in making diamond wire, which wire is used to cut stone; but Imex contended that the beads delivered to it by Co. Fi. were defective, because Imex's customers stated that the diamond wire was defective. Co. Fi. had a policy of granting a credit for defective beads, but to receive the credit, Imex had to return the defective beads to Co. Fi. for verification of the defects, which was not done in this case. As part of the purchase agreement, Imex alleged that it was to act as Co. Fi.'s exclusive sales agent in the United States if Imex purchased $300,000 worth of beads annually and that Imex would receive a rebate of five percent for sales in excess of such sum; however, there was no written evidence of the rebate or the agency agreement. Co. Fi. sued Imex on open account for nonpayment of the beads shipped, and Imex answered and countersued for damages for set-off and recoupment. Imex never returned to Co. Fi. any of the beads that it contended were defective. Co. Fi. moved for summary judgment, which was granted. Finding no error, we affirm.

### Case No. A03A1218

The owner of Wires, Emilio Brocco, told Imex that the defects that Imex customers complained of in its manufactured diamond wire were not caused by defective beads but, rather, were caused by the plastification machine used by Imex to manufacture the diamond wire. The plastification machine melts polyurethane and injects the

molten polyurethane around the diamond beads in dies holding the diamond beads against the cable; the beads and polyurethane coat the aircraft cable to create diamond wire. Brocco recommended that Imex buy Wires' plastification machine, because Wires' machine was different and superior to the machines Imex already had. Brocco stated that Wires' machine would resolve any of Imex's problems with its final product.

Prior to delivery, Imex made the down payment check payable to Co. Fi. instead of Wires, and the January 9, 1999 down payment check for $35,000 was returned to Imex to be reissued to Wires. On December 15, 1998, and January 4, 1999, Wires invoiced Imex $89,000 for the total purchase price of the machine. On January 20, 1999, Imex received the invoice and treated it as a pro forma invoice, because Imex believed that Wires was engaged in the European business custom of allowing the contract price to be negotiated, even after delivery of the goods. On February 28, 1999, Imex paid Wires $35,000 as partial payment, and Imex contended that the balance of the purchase price was to be negotiated.

Prior to the purchase, Amini Bijani, Imex's engineer, production manager, and vice-president, went to Italy to examine, inspect, and test the plastification machine; he inspected the machine for three hours. Imex did not request that Bijani be allowed to examine and observe the machine in operation for three to four weeks, as it contended was necessary for a proper inspection, because as the production manager, Bijani could not be spared from Imex's plant. In January 1999, the machine arrived at the Imex plant prior to any payment. After delivery, Imex tested Wires' plastification machine for one month before stopping its usage because the machine was the same as those already in use by Imex and performed no better than the two machines already in use. Massoud Besharat, Imex's president, testified that a reasonable inspection and testing of the machine required three to four weeks. The machines had no written warranties. Imex never made any effort to return the machine to Wires after it rejected the machine in writing on July 22, 1999, because Imex wanted partial payment, shipping costs, and custom duties reimbursed.

1. Imex contends that the trial court erred in granting summary judgment on an open account, because it contends that there was a genuine issue of material fact regarding the purchase price of the plastification machine. We do not agree.

(a) This was a suit on open account brought by the seller, a merchant, who extended credit and delivered tangible property in the ordinary course of business, against the purchaser, a merchant, who did business with the seller on credit. An action for an open account on invoice is an action on implied contract where the seller

fully performed on a unilateral contract by delivery of the goods and where the purchaser either expressly or impliedly promised to pay by acceptance of the goods shipped. OCGA §§ 7-4-16 ("Unless otherwise provided in writing signed by the obligor, a commercial account becomes due and payable upon the date a statement of the account is rendered to the obligor. . . . 'Commercial account' means an obligation for the payment of money arising out of a transaction to sell or furnish, or the sale of, or furnishing of, goods or services other than a 'retail installment transaction.'"); 9-2-7 (implied contract); 9-3-25 (suit on open account); *Wheat Enterprises v. Redi-Floors*, 231 Ga. App. 853, 855-856 (1) (501 SE2d 30) (1998); *Gage v. Tiffin Motor Homes*, 153 Ga. App. 704, 706-707 (1) (266 SE2d 345) (1980); *Gordy Tire Co. v. Bulman*, 96 Ga. App. 739, 741 (1) (101 SE2d 220) (1957).

> An action on open account is a simplified pleading procedure where a party can recover what he was justly and equitably entitled to without regard to a special agreement to pay such amount for goods or services as they were reasonably worth when there exists no dispute as to the amount due or the goods or services received. An action on open account may be brought for materials furnished and work performed. However, if there is a dispute as to assent to the services or to acceptance of the work done or as to what work was to be performed and the cost, then an action on open account is not a proper procedure.

(Citations omitted.) *Watson v. Sierra Contracting Corp.*, 226 Ga. App. 21, 27 (b) (485 SE2d 563) (1997); accord *Wheat Enterprises v. Redi-Floors*, supra at 855-856.

> Furthermore, in the absence of a liquidated demand, OCGA § 7-4-16 is inapplicable. A debt is liquidated when it is certain how much is due and when it is due. A liquidated claim is an amount *certain* and *fixed*, either by the act and agreement of the parties or by operation of law; a sum which cannot be changed by the proof.

(Citations and punctuation omitted; emphasis in original.) *Wheat Enterprises v. Redi-Floors*, supra at 856. When the seller attaches the invoice to the complaint showing the goods shipped, the price, and the balance due, such constitutes a sufficient suit on an open account and sets forth liquidated damages. *Gordy Tire Co. v. Bulman*, supra at 741. When the authenticated invoice has been tendered into evidence in a suit on open account and is supported by testimony that the invoiced amount was unpaid, a prima facie case for the seller has been proven. *White Stores, Inc. v. Washington*, 135 Ga. App. 67, 68

(217 SE2d 391) (1975). The purchaser who admits receipt of the goods has the burden of proving that the amount of the invoice was incorrect or that there was a failure of consideration for the goods at trial, because a rebuttable presumption arises that there was full performance at the invoice price. *Andrews v. Adams Drive, Ltd.*, 142 Ga. App. 32, 33-34 (4) (234 SE2d 835) (1977); *F. N. B. Financial Co. &c. v. Glaze Tire Co.*, 140 Ga. App. 184, 185 (230 SE2d 342) (1976). However, when there exists a bona fide dispute as to the amount due or the receipt of goods, open account is the wrong theory of recovery, because such simplified action is for cases where a party seeks to recover what he justly and equitably is entitled to without regard to any special agreement as to payment. *Zampatti v. Tradebank Intl. Franchising Corp.*, 235 Ga. App. 333, 343-344 (10) (508 SE2d 750) (1998); *Schluter v. Perrie, Buker, Stagg & Jones, P.C.*, 230 Ga. App. 776, 777 (1) (498 SE2d 543) (1998) (physical precedent only); *Watson v. Sierra Contracting Corp.*, supra.

In this case, Imex admitted delivery and receipt of the goods, which is an essential element of an action on open account against it. OCGA § 11-2-103 (1) (c); *Roberson v. Ocwen Fed. Bank*, 250 Ga. App. 350, 351 (1) (553 SE2d 162) (2001); *Mountain Bound v. Alliant Food-Service*, 242 Ga. App. 557, 559-560 (3) (530 SE2d 272) (2000). Also, the evidence in this action on open account showed that Wires fully performed in the sale of the invoiced goods, because Imex admitted that it owed Wires some sum for the machine. *Five Star Steel Constr. v. Klockner Namasco Corp.*, 240 Ga. App. 736, 738-739 (1) (524 SE2d 783) (1999). When the buyer fails to object timely to the invoice or demand letter for payment prior to suit on an open account, the rebuttable presumption arises that there is agreement as to the amount stated in the invoice as correct, because this constitutes an admission by silence when there exists a duty to answer. OCGA §§ 24-3-36 (admission by silence); 24-4-23 (presumption of correctness from failure to reply to business correspondence); *Russell v. Wickes Lumber*, 190 Ga. App. 16, 18 (7) (378 SE2d 148) (1989); *Advanced Contouring v. McMillan Div. of States Engineering Corp.*, 179 Ga. App. 128 (1) (345 SE2d 666) (1986); *Merry v. Ga. Big Boy Mgmt.*, 135 Ga. App. 707, 710 (3) (218 SE2d 694) (1975); *Haynes v. Phillips*, 67 Ga. App. 574, 577-578 (2) (21 SE2d 261) (1942); *Butler Bros., Inc. v. Goldstein*, 49 Ga. App. 109 (1) (174 SE 202) (1934).

Other than the self-serving belief of Imex's president that the invoice price was not $89,000 and was negotiable, the uncontradicted written, as well as oral, evidence was that the invoice price was a fixed price of $89,000, of which $35,000 had been paid after delivery. Further, Imex paid, without any condition or limitation, the $35,000 after knowing the invoice price.

(b) Under the Uniform Commercial Code, this was a sale between merchants who were knowledgeable about the plastification machine sold. Under OCGA § 11-2-104 (1), a person who deals in goods of the kind, or (3) a person to whom such knowledge or skill may be attributed by his employment of an agent who holds himself out as having knowledge or skill, causes the party to be treated as a merchant. Imex already had two plastification machines and had operated these machines for some years; further, Imex sent its engineer and production manager to Italy to inspect Wires' plastification machine for possible purchase. Thus, Imex was a merchant within the meaning of the UCC.

Under OCGA § 11-2-201 (2), the invoice confirmed the contract in writing, satisfying the Statute of Frauds as to the terms of sale between merchants, including the purchase price for suit on open account. *Bicknell v. Joyce Sportswear Co.*, 173 Ga. App. 897, 898 (2) (328 SE2d 564) (1985); *Dalesso v. Reliable-Triple Cee of North Jersey*, 167 Ga. App. 372, 373 (1) (306 SE2d 415) (1983). Not only did the invoice constitute the written confirmation of the agreement, the delivery and acceptance of the machine took the agreement out of the Statute of Frauds by part performance. *Bicknell v. Joyce Sportswear Co.*, supra at 897. As merchants under OCGA § 11-2-201 (2), Imex had to give notice of objection within ten days of receipt of the invoice confirming the terms of the contract in writing as to the sale price of the machine, but it failed to do so within the time provided by the UCC. *Jem Patents, Inc. v. Frost*, 147 Ga. App. 839, 840 (1) (250 SE2d 547) (1978); see also *Kohlmeyer & Co. v. Bowen*, 126 Ga. App. 700, 701-702 (2) (192 SE2d 400) (1972).

2. Imex contends that the trial court erred in granting summary judgment, because there were issues of acceptance of the plastification machine or the revoking of any acceptance made by it. We do not agree.

This sale between merchants comes within the UCC; Imex tendered no evidence that this was a "sale on approval," allowing it to further inspect or test the machine after delivery and prior to becoming obligated to pay. OCGA § 11-2-326 (1) (a). Imex had the opportunity to inspect the plastification machine in Italy, and Imex did not either request additional time to inspect or request for a "sale on approval," which would have allowed it to inspect for a reasonable time after delivery. OCGA § 11-2-326 (1) (a). Imex admitted that Wires made a tender of delivery to it under OCGA § 11-2-507 and that Imex received delivery of the plastification machine.

(a) Prior to ordering the machine, Imex's engineer and production manager conducted a three-hour inspection of the machine at Wires' plant in Italy. Without authority, after delivery, Imex made further inspection within the meaning of OCGA § 11-2-513 (1). How-

ever, Wires shipped the machine marked COD on the top of the invoice; COD under the UCC meant that Wires denied Imex the right to inspect prior to acceptance. OCGA § 11-2-513 (3) (a). Thus, within the meaning of OCGA § 11-2-606 (1), Imex accepted the machine on delivery and had no subsequent right to reject for nonconformity. *Bicknell v. B & S Enterprises*, 160 Ga. App. 307, 308 (1) (287 SE2d 310) (1981).

(b) Further, Imex accepted the machine and used it for over a month without giving a seasonable notice of rejection. See *Seminole Peanut Co. v. Goodson*, 176 Ga. App. 42, 45 (1) (335 SE2d 157) (1985) (buyer that received and accepted peanuts from seller cannot argue that there is no enforceable contract). Even if Imex had the right to inspect and to reject the goods, then such rejection had to be given by notice within a seasonable time after delivery. A rejection is ineffective when the seller has not been seasonably notified of the rejection in such terms that the seller can understand that the notice constitutes a rejection of the goods delivered. OCGA § 11-2-602; *Prudential Metal Supply Corp. v. Atlantic Freight Sales Co.*, 204 Ga. App. 439, 440 (419 SE2d 520) (1992).

(c) In this case, the July 22, 1999 letter from Besharat to Brocco told Wires for the first time that the machine was rejected, which was nearly six months from the early January delivery date; thus, it was an ineffective wrongful rejection. *Prudential Metal Supply Corp. v. Atlantic Freight Sales Co.*, supra at 440 (the buyer's failure to seasonably notify the seller of a rejection constitutes acceptance). While an acceptance can be revoked when the goods do not conform, substantially impairing its value, such revocation of acceptance must be made within a reasonable time after the buyer discovers or should discover the nonconformity, which was not done in this case either. OCGA § 11-2-608; *Prudential Metal Supply Corp. v. Atlantic Freight Sales Co.*, supra at 440; *Bicknell v. B & S Enterprises*, supra at 308-309 (2); *Griffith v. Stovall Tire & Marine*, 174 Ga. App. 137 (1) (329 SE2d 234) (1985).

(d) Imex's continued use of the machine for a month should have disclosed any defect or nonconformity. A buyer's use of defective goods after rejection constitutes reacceptance. *W. M. Hobbs, Ltd. v. Accusystems of Ga.*, 177 Ga. App. 432-433 (1) (339 SE2d 646) (1986). If the machine failed to conform to its contract description, giving Imex the right to reject, then the continued use for a month and the delay in notice of rejection constituted a reacceptance of the machine, because such use was inconsistent with rejection and was inconsistent with the seller's ownership of the goods. Id. at 432; *Griffith v. Stovall Tire & Marine*, supra at 138.

(e) Unseasonable rejection through delay constitutes a wrongful rejection and entitled Wires to sue for the invoiced sales price under

OCGA §§ 11-2-602 (3) and 11-2-703 (e). *Lipsey Motors v. Karp Motors*, 194 Ga. App. 15, 19 (3) (389 SE2d 537) (1989); *Cochran v. Horner*, 121 Ga. App. 297, 298 (2) (173 SE2d 448) (1970).

(f) Imex, in its notice of rejection of the plastification machine, failed to particularize the defects so that Wires had an opportunity to remedy and to cure timely any defect; Imex contended that the machine was defective because Wires' plastification machine did not perform in a superior manner to the machines that Imex already had and gave the same performance as its machines. Where a curable defect existed, failure to state the defect in the notice of rejection acts as a waiver of such objection, because such failure denies the seller the opportunity to cure such defect. OCGA § 11-2-605 (1) (b).

Besharat's letter of rejection to Wires failed to particularize any alleged defects; Besharat merely complained, "[t]his machine does not work and we are prepared to return it to you." This notice failed to satisfy the requirements of specificity of the defects. OCGA § 11-2-605 (1) (b).

(g) To reject goods, there must be either defects or nonconformity of the goods to the description of the goods. Under OCGA § 11-2-315, the implied warranty of fitness for a particular purpose, the product must be defective when it has latent defects that renders it not merchantable and fit for the particular purpose intended. Imex's evidence was that the Wires machine performed as well as Imex's two machines, which would, thus, pass in the trade for such goods. If Wires' machine was equal to the machines Imex already had, then the Wires machine would pass in the trade as not defective. See OCGA § 11-2-314 (2); see generally *Firestone Tire &c. Co. v. Jackson Transp. Co.*, 126 Ga. App. 471, 474-475 (1) (191 SE2d 110) (1972).

3. Imex contends that the trial court erred in granting summary judgment because there were material issues of fact as to the failure of consideration. We do not agree.

Imex admits that Wires' machine performed as well as Imex's own machines; in the July 22, 1999 letter, Besharat admitted that the machine was worth $55,000. Therefore, Wires' machine had value, so that there could be no defense of a total failure of consideration. A plea of partial failure of consideration cannot be sustained where the buyer makes payments when it knew or should have known that the goods were defective. *Morgan v. Printup Bros. & Pollard*, 72 Ga. 66, 68 (1) (1883); *Coast Scopitone v. Self*, 127 Ga. App. 124, 126 (1) (192 SE2d 513) (1972). The $35,000 payment, although it was supposed to be paid prior to delivery, was made after delivery and use by Imex. See *Coast Scopitone v. Self*, supra at 127 (3).

4. Imex contends that the trial court erred in granting summary judgment to Wires, because the trial court lacked jurisdiction to

entertain the suit of a foreign corporation absent a certificate of authority. We do not agree.

Under OCGA § 14-2-1501 (b) (5) ("[e]ffecting sales through independent contractors"), (6) ("[s]oliciting or procuring orders, whether by mail or through employees or agents or otherwise, where the orders require acceptance without this state before becoming binding contracts and where the contracts do not involve any local performance other than delivery and installation"), or (11) ("[e]ffecting transactions in interstate or foreign commerce") each states exclusions from the requirement of a certificate of authority under OCGA § 14-2-1502 which applied to Wires. *Manufacturers Nat. Bank of Detroit v. Tri-State Glass*, 201 Ga. App. 253 (1) (410 SE2d 808) (1991) (one or more isolated transactions in Georgia do not constitute "transacting business"); *Work Clothes Outlet v. M & S Purchasing*, 188 Ga. App. 179, 181 (3) (372 SE2d 509) (1988) (officer's trip to Georgia several times a year to solicit orders to be shipped from out of state is exempt); *Unilease No. 16 v. Dunrite Sales Corp.*, 147 Ga. App. 728, 729 (2) (250 SE2d 179) (1978).

Where the foreign corporation's business transactions are exclusively or dominantly interstate or foreign commerce, such business will be characterized as "interstate or foreign commerce" for exclusion. *Record Data, Inc. v. Vinylgrain Indus. of Ga.*, 143 Ga. App. 854, 855 (2) (240 SE2d 223) (1977). The purpose of the interstate and foreign commerce exclusion is to prohibit a state from discriminatory legislation that excludes, obstructs, burdens, regulates, or interferes with a foreign corporation's right to engage in interstate and foreign commerce, because the "commerce clause" of the federal constitution preempted such exercise of control. *DeKalb Cablevision Corp. v. Press Assn.*, 141 Ga. App. 1, 2-3 (232 SE2d 353) (1977). Where the transaction sued upon by the noncertified foreign corporation arose out of interstate or foreign commerce, an action may be pursued even where the foreign corporation would be required to obtain a certificate of authority for other transactions which occurred intrastate. *Briarcliff Communications Group v. Associated Press*, 154 Ga. App. 369, 370 (268 SE2d 356) (1980).

## Case No. A03A1219

Since 1996, Imex purchased diamond wire and diamond beads from Co. Fi., an Italian corporation. On January 4, 1999, Imex purchased orders of both diamond wire and diamond beads from Co. Fi., and Co. Fi. shipped these orders with four separate invoices, totaling $81,500 for the goods. Imex admits receipt of the goods and the correctness of the invoices. On May 5, 2000, Co. Fi. sent a demand letter for payment of the balance due from Imex. On May 11, 2000, Imex

responded, demanding credits and including two post-dated checks for $52,669.50, the balance after the alleged credits. Then, on May 29, 2000, Imex issued stop payment orders on the checks, because Co. Fi. refused to ship an additional order for 40,000 diamond beads. On June 7, 2000, Co. Fi. sent Imex a demand letter for $81,500 and gave Imex ten days within which to contest the amount.

Co. Fi. had a policy of replacing defective beads, but it required the return of the beads to determine that they were, in fact, defective. Although Imex followed the return policy in 1998 through March 1999, it did not do so subsequently and asserted that Co. Fi. owed it a performance credit for the beads manufactured into diamond wire that the Imex customers alleged were defective. Imex did not dispute that it owed Co. Fi. $52,000, when the credits are considered. However, Imex did not have its customers return the allegedly defective diamond wire to it; therefore, Imex could not return the allegedly defective beads to Co. Fi. so that it could determine whether there were defects in its supplied beads or defects in the wire that Imex manufactured with the beads.

Further, Imex contended that Co. Fi. had made an oral agreement with Imex to give it a five percent rebate on Imex's annual purchases in excess of $300,000. Co. Fi. denied such oral agreement. There existed no written evidence of such agreement.

On October 25, 2000, Co. Fi. sued Imex for $81,500 on open account; on December 13, 2000, Imex answered and counterclaimed.

5. Imex contends that the trial court erred in granting summary judgment, because it contends that there was an issue of fact as to the acceptance of the diamond beads. We do not agree.

Imex admits the receipt of the diamond beads and use of the beads to manufacture diamond wire, which it sold to its customers. See *Seminole Peanut Co. v. Goodson*, supra at 42. The Imex customers complained that the diamond wire was defective, did not return the wire, and wanted credit for the defective wire from Imex.

Where payment for goods has been received and accepted, whether in full or in part, or where the goods have been received and paid for, there is an acceptance of the goods under the UCC. OCGA § 11-2-201; *Bicknell v. Joyce Sportswear Co.*, supra at 897 (2). Tender of either full or part payment for goods received constitutes acceptance. Id.

Imex contends that the acceptance of the diamond beads only occurred when Imex's customers were satisfied with the diamond wire manufactured from the diamond beads, because Co. Fi. gave credit for defective beads. However, there was no written agreement that such would constitute acceptance.

A rejection of goods is ineffective when notice of rejection has not been seasonably made. OCGA § 11-2-602; *Prudential Metal Supply*

*Corp. v. Atlantic Freight Sales Co.*, supra at 439. Thus, an unseasonable rejection through delay constitutes a wrongful rejection and entitled Co. Fi. to sue for the balance of the sales price. OCGA § 11-2-703; *Lipsey Motors v. Karp Motors*, supra at 19 (3); *Cochran v. Horner*, supra at 298 (2).

When a raw product is used to manufacture a finished product that is sold to users, the use of such beads in manufacturing diamond wire is inconsistent with the seller's ownership, constituting acceptance under the UCC. OCGA § 11-2-606 (1) (c). Here, by use of the beads as raw materials in a diamond wire process and sale of the finished wire, Imex put the goods beyond Co. Fi.'s ability to cure any defects. Further, by not having the beads returned to Imex by its customers, Imex made it impossible for either Imex or Co. Fi. to determine if the beads were defective or to attempt a cure of the defects.

Further, when a buyer fails to make an effective rejection after a reasonable opportunity to inspect such goods after receipt and delivery, the UCC treats this as acceptance. OCGA § 11-2-606 (1) (b). Here, Imex had the opportunity to inspect prior to the use of the beads and gave no timely notice of rejection. Holding the goods from January until July 22, 1999, did not constitute a seasonable notice of rejection after inspection.

Imex failed in its rejection notice by failing to particularize the defects as required under the UCC so that Co. Fi. had an opportunity to cure any defects. Thus, the notice of rejection failed. OCGA § 11-2-605 (1) (b).

6. Imex contends that the trial court erred in granting summary judgment, because there were material issues of fact as to revoked acceptance. We do not agree.

Imex contends that, even if there was acceptance, under OCGA § 11-2-608 (1), the UCC allowed Imex to revoke acceptance when its clients found the diamond wire defective.

Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

OCGA § 11-2-608 (2). In this case, Imex failed to inspect prior to use, used the beads to make diamond wire by coating the beads in polyurethane, and sold it. The notice of rejection occurred months after delivery, when the customers complained that the diamond wire was defective and when Co. Fi. demanded payment. Thus, notice of rejection was not seasonably made and was made after change in the beads. *Griffith v. Stovall Tire & Marine*, supra at 137. Revocation is

not effective until the buyer notifies the seller of the rejection; thus, a buyer, rightfully revoking acceptance, has the rights and obligations as a buyer who rightfully rejects. Therefore, an unseasonable revocation of acceptance has no effect. OCGA § 11-2-608; *Jacobs v. Metro Chrysler-Plymouth*, 125 Ga. App. 462 (1) (188 SE2d 250) (1972).

7. Imex contends that the trial court erred in granting summary judgment, because there were issues of material fact as to the failure of consideration defense. We do not agree.

Failure of consideration under OCGA § 13-5-9, either total or partial, is an affirmative defense. Thus, when the evidence establishes that the goods have some value, a defense of total failure of consideration fails. Likewise, a partial failure of consideration also fails where the buyer makes payments when it knew or should have known that the goods were defective. *Morgan v. Printup Bros. & Pollard*, supra at 66; *Coast Scopitone v. Self*, supra at 124.

Imex admitted to owing $52,669 so that the total failure of consideration defense failed. Imex tendered payment after it knew or should have known of the alleged defects; therefore, the partial failure of consideration also failed.

8. Imex contends that the trial court erred in granting summary judgment, because there are material issues of fact as to the defenses of set-off and recoupment. We do not agree.

Under OCGA § 13-7-1, a set-off allows a debtor to set off a debt owed to him by the creditor against his debt to the creditor but does not act as a denial of the creditor's claim. In contrast, recoupment is the right of the debtor to deduct from the creditor's damages any amounts owed by the creditor to the debtor by virtue of cross-obligations or independent covenants arising under the same contract. OCGA § 13-7-2.

On motion for summary judgment, Co. Fi. had the burden of showing the absence of any evidence in support of an essential element of fact under each affirmative defense. Co. Fi. met this burden by pointing to the lack of competent written evidence in the record supporting such alleged agreement. Therefore, Imex relied upon parol evidence as to an alleged oral agreement as to the right to a five percent rebate over multiple years, which violated the Statute of Frauds, which was denied by Co. Fi. See OCGA § 13-5-30; *Yarborough v. Hi-Flier Mfg. Co.*, 63 Ga. App. 725, 728-729 (12 SE2d 133) (1940). Further, Co. Fi. proved that, in the period in question, Imex failed to return allegedly defective beads prior to being eligible for any credit for defective products. All Imex established was that its diamond wire was alleged defective in some way by Imex customers who did not return the product. Thus, Imex failed to introduce any evidence creating a material issue of fact that it was owed anything by Co. Fi.

9. Imex contends that the trial court erred in granting summary judgment, because there existed material issues of fact whether Co. Fi., as a foreign corporation, needed a certificate of authority to bring this suit. We do not agree.

Imex argues that Co. Fi., an Italian corporation that only solicits business in Georgia, and which orders in Georgia are accepted in Italy with delivery in Georgia, must have a certificate of authority as a foreign corporation. OCGA § 14-2-1502 (a). However, the facts of this case clearly bring Co. Fi. under the exclusion of OCGA § 14-2-1501 (b) (6) where the contracts "do not involve any local performance other than delivery." See *Manufacturers Nat. Bank v. Tri-State Glass*, supra at 253; *Work Clothes Outlet v. M & S Purchasing*, supra at 181 (3); *Unilease No. 16 v. Dunrite Sales Corp.*, supra at 729 (2). Further, Co. Fi. comes under OCGA § 14-2-1501 (b) (11) as a foreign corporation whose transaction of business is "[e]ffecting transactions in interstate or foreign commerce." *Briarcliff Communications Group v. Associated Press*, supra at 369; *Record Data, Inc. v. Vinylgrain Indus. of Ga.*, supra at 854; *DeKalb Cablevision Corp. v. Press Assn.*, supra at 1.

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

DECIDED MAY 5, 2003 —
RECONSIDERATION DENIED MAY 21, 2003 — 

*Phelps & Campbell, R. Chris Phelps, Leverett & Daughtry, Robert F. Leverett*, for appellant.

*Fortson, Bentley & Griffin, Roy E. Manoll III, Richard G. Douglass*, for appellees.