[Nos. A105461, A106368. First Dist., Div. One. Sept. 2, 2005.]

JACQ WILSON et al., Plaintiffs and Respondents, v.
BRAWN OF CALIFORNIA, INC., Defendant and Appellant.

COUNSEL

Severson & Werson, Donald J. Querio, Katherine A. Knopoff; Grippo & Elden, Charles S. Bergen, George R. Dougherty and Maile H. Solis for Defendant and Appellant.

Levy, Ram & Olson, Arthur D. Levy, Heather M. Mills; and Wayne L. Lesser for Plaintiffs and Respondents.

AARP Foundation Litigation, Barbara Jones, Thomas Osborne and Michael Schuster for AARP as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

**STEIN, J.**—The San Francisco Superior Court entered judgment against Brawn of California, Inc. (Brawn), a mail order company, ruling that Brawn had engaged in a deceptive business practice by charging its customers an "insurance fee" of $1.48 with every order placed. The ruling presumed that Brawn, rather than its customers, bears the loss of risk in transit, so that its customers received nothing of value in return for paying the fee. The court also awarded plaintiff litigation expenses in the amount of $24,699.21 and attorney fees in the amount of $422,982.50.

We reverse, concluding that Brawn did not bear the risk of loss of goods in transit under the applicable California Uniform Commercial Code sections discussed, *post*.

BACKGROUND

Brawn markets clothing through its catalogs and over the Internet. When a customer places an order, Brawn packages it, and holds it at its warehouse, where it is picked up by a common carrier and delivered to the customer, using an address provided by the customer. At all times relevant, the terms of Brawn's mail order form required the customer to pay the listed price for the goods purchased, plus a delivery fee and a $1.48 "insurance fee." As to the last, the form recited: "INSURANCE: Items Lost or Damaged in Transit Replaced Free." Brawn based the insurance fee on the costs to it of replacing any goods lost in transit, and Brawn did indeed replace, without further cost to the customer, any goods that had been lost in transit. Brawn rarely, if ever, sold its goods to a customer unwilling to pay the insurance fee.

On February 5, 2002, and again on February 7, 2002, plaintiff Jacq Wilson (plaintiff) purchased items from Brawn's catalogue, each time paying the

insurance fee. On February 13, 2002, Wilson, acting on behalf of himself and all other similarly situated persons, brought suit against Brawn, contending that in charging the fee, Brawn violated the unfair competition law, Business and Professions Code section 17200 et seq., prohibiting unfair competition, and Business and Professions Code section 17500 et seq., prohibiting false advertising.[1]

Plaintiff's suit was premised on the theory that by charging customers an insurance fee, Brawn suggested to them that they were paying for and receiving a special benefit—insurance against loss in transit—when in fact, customers did not need insurance against loss in transit because Brawn already was required to pay for that loss as a matter of law. The trial court agreed, finding that irrespective of the insurance fee, Brawn bore the risk of loss of goods in transit, reasoning that the fee was an "illusory" benefit. The court found that Brawn's customers were likely to be deceived by the insurance fee, and that Brawn therefore had engaged in a deceptive business practice, entitling its customers to restitution.

### STANDARD OF REVIEW

Our decision is based on our construction and application of statutory law, and not on any disputed issue of fact. Questions of law, such as statutory interpretation or the application of a statutory standard to undisputed facts, are reviewed de novo. (*Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 212 [100 Cal.Rptr.2d 718].)

### DISCUSSION

Neither party has cited any significant source of law concerning mail order sales or the risk of loss in mail order consumer sales, resting their contentions on provisions of the California Uniform Commercial Code.[2] As the California Uniform Commercial Code, and the cases cited there, typically involve arm's-length sales between fairly sophisticated parties, the fit is not perfect. Nonetheless, there appears to be little legislation or case law specifically concerned with mail order sales or risk of loss in consumer sales contracts, and we, too, turn to the California Uniform Commercial Code's provisions.

California Uniform Commercial Code section 2509 sets forth the general rules for determining which party bears the risk of loss of goods in

---

[1] We allowed supplemental briefing on a question currently pending in the Supreme Court: the effect on pending cases of Proposition 64's changes to the unfair competition law, approved by the voters on November 2, 2004. As our decision is not in any way based on the portions of the unfair competition law affected by Proposition 64, we do not reach the question.

[2] California adopted a version of the Uniform Commercial Code in 1963, effective January 1, 1965. (Stats. 1963, ch. 819, p. 1849.)

transit when there has been no breach of contract. Subdivision (1) of section 2509 provides, as relevant: "(1) Where the contract requires or authorizes the seller to ship the goods by carrier [¶] (a) If it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier . . . ; but [¶] (b) If it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery."

*Shipment Contract or Destination Contract*

■ Official Code comment 5 to Uniform Commercial Code section 2-503, concerning the seller's manner of tendering delivery, explains: "[U]nder this Article the 'shipment' contract is regarded as the normal one and the 'destination' contract as the variant type. The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, unless he has specifically agreed so to deliver or the commercial understanding of the terms used by the parties contemplates such a delivery." (Official Comments on U. Com. Code, Deering's Ann. Cal. U. Com. Code (1999 ed.) foll. § 2503, p. 198.) Of course, a seller will have to provide the carrier with shipping instructions. It follows that a contract is not a destination contract simply because the seller places an address label on the package, or directs the carrier to "ship to" a particular destination. "Thus a 'ship to' term has no significance in determining whether a contract is a shipment or destination contract for risk of loss purposes." (*Eberhard Manufacturing Company v. Brown* (1975) 61 Mich.App. 268 [232 N.W.2d 378, 380].) The point is illustrated in *La Casse v. Blaustein* (1978) 93 Misc.2d 572 [403 N.Y.S.2d 440], where the plaintiff, a student in Massachusetts, purchased 23 pocket calculators by telephone from a New York manufacturer. The method of shipment was left to the seller, but the plaintiff wrote a check to cover postage, and directed the seller to ship the goods to the plaintiff's residence. The court held: "Under the Uniform Commercial Code, the sales contract which provides for delivery to a carrier is considered the usual one and delivery to a particular destination to a buyer the variant or unusual one. [Citations.] In view of the foregoing, the request of the plaintiff's letter to ship to his residence is insufficient to convert the contract into one requiring delivery to a destination rather than one to a carrier. The request was nothing more than a shipping instruction and not of sufficient weight and solemnity as to convert the agreement into a destination contract." (*Id.* at p. 442.) Similarly, in *California State Electronics Assn. v. Zeos Internat. Ltd.* (1996) 41 Cal.App.4th 1270 [49 Cal.Rptr.2d 127], one of the few California cases discussing the issue, the court held: "The evidence showed that Zeos's sales operation consists of telephone orders which are shipped at the buyer's expense via an overnight express service. The paperwork Zeos prepares and sends to the buyer, with the goods or shortly after

their shipment, contains no provision requiring Zeos to deliver the goods to the buyer. These facts plainly mark Zeos's terms as 'shipment' contracts, which is the presumptive form." (*Id.* at p. 1277.)[3]

In addition, although the risk of loss does not necessarily pass at the same time title to the goods passes, California Uniform Commercial Code section 2401, subdivision (2)(a), provides that "[i]f the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at [a] destination, title passes to the buyer at the time and place of shipment." This section, therefore, also distinguishes between the seller's obligation to deliver goods to a carrier, and the seller's obligation to deliver goods to the buyer.

It is not at all uncommon for a contract to shift the risk of loss to the buyer at the point at which the seller delivers the goods to a common carrier, while calling for the seller to pay for delivery and insurance. The California Uniform Commercial Code recognizes this type of contract in its provisions pertaining to the term "C.I.F."[4] "The term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination." (Cal. U. Com. Code, § 2320, subd. (1).) Official comment 1 to the section explains that "[t]he C.I.F. contract is not a destination but a shipment contract with risk of subsequent loss or damage to the goods passing to the buyer upon shipment if the seller has properly performed all his obligations with respect to the goods. Delivery to the carrier is delivery to the buyer for purposes of risk and 'title.' " Official Code comment 5 to Uniform Code section 2-503, similarly, explains that a term requiring the seller to pay the freight or the cost of delivery is not to be interpreted as the equivalent of a term requiring the seller to deliver to the buyer or to an agreed destination. In a standard "C.I.F." contract, then, the buyer bears the risk of loss in transit even though the cost of insurance is rolled into the purchase price and is in fact paid by the seller. By breaking out the cost of insurance, and requiring the buyer to pay it, Brawn's mail order contracts even more clearly place the risk of loss in transit on the buyer.

Other evidence, while not determinative, is consistent with the conclusion that Brawn, at least, intended the contracts to be shipment contracts. Brawn's own insurance covers goods lost while in Brawn's possession, but does not

---

[3] While *Merchants Acceptance, Inc. v. Jamison* (1999) 752 So.2d 422 reasoned that a contract was a destination contract because it contained a term specifying the buyer's street address as the place of delivery, the author of 3a-8 Sales and Bulk Transfers Under the UCC cites *Jamison* as an illustration of a simple mistake courts occasionally make. (Bender's U.C.C. Service, Duesenberg et al., 3a-8 Sales & Bulk Transfers, § 8.02, p. 8-9, fn. 9.)

[4] The parties often make their intent explicit by using terms such as "F.O.B.," "F.A.S.," "C.I.F." or "C. & F." (See Cal. U. Com. Code, §§ 2319 & 2320.) The general rule is that a contract containing neither an F.O.B term nor any other term explicitly allocating loss is a shipment contract. (*Eberhard Manufacturing Company v. Brown, supra,* 232 N.W.2d at p. 380.)

cover goods destroyed or lost after the goods left Brawn's physical possession. Brawn pays California use tax, rather than sales tax, on the theory that the goods were "sold" when they left Brawn's place of business, located outside of California. Brawn records the revenue for the goods sold at the point of shipment, and removes the goods from its inventory at the time of shipment.

█ In sum, nothing in Brawn's conduct, and nothing in the delivery or insurance terms of Brawn's mail order forms, suggests that it was offering anything other than a standard, C.I.F.-type shipment contract, which the customers agreed to when they used Brawn's mail order form to purchase goods.

*Sales on Approval*

Plaintiff, however, contended, and the trial court agreed, that Brawn's mail order contracts were "sales on approval," where, as a general rule, the seller bears the risk of loss in transit. The contention was and is based on the provision that Brawn's customers are entitled to return any goods with which they are not satisfied for a refund of the purchase price or credit toward another purchase. Plaintiff also contended that the practice of allowing customers to return goods for a full refund is so common in the industry as to establish a trade usage, asserting that even if the written terms of Brawn's contracts establish that they are shipment contracts, the written terms must be modified by trade usage so as to make the contracts "sales on approval."

The legal support for the claim that Brawn's contracts are "sales on approval" is contained in California Uniform Commercial Code sections 2326 and 2327. Section 2326, subdivision (1) provides: "Unless otherwise agreed, if delivered goods may be returned by the buyer even though they conform to the contract, the transaction is [¶] (a) A 'sale on approval' if the goods are delivered primarily for use, and [¶] (b) A 'sale or return' if the goods are delivered primarily for resale." California Uniform Commercial Code section 2327, subdivision (1)(a) provides that unless otherwise agreed, under a sale on approval, "the risk of loss and the title do not pass to the buyer until acceptance."[5]

█ The initial flaw in plaintiff's contention is that a "sale on approval" places the risk of loss in transit on the seller "unless otherwise agreed."

---

[5] California Uniform Commercial Code section 2509, subdivision (4), expressly recognizes that a sale on approval may vary the terms of what otherwise might be a standard shipment contract, providing, "[t]he provisions of this section [determining the risks of loss of goods in transit] are subject to contrary agreement of the parties and to the provisions of this division on sale on approval."

Brawn's contract specifically and expressly calls for the buyer to pay for shipping and insurance, placing the risk of loss in transit on the buyer. ■ It also is well established that the express terms of the agreement control usage of trade. (Cal. U. Com. Code, § 2208, subd. (2).) Therefore, even if plaintiffs established that most contracts in the trade are "sales on approval" (and they did not), the express terms of Brawn's contract control.

■ In any event, California Uniform Commercial Code section 2326 is designed to distinguish between two forms of bailment, not to convert ordinary retail sales contracts into "sales on approval." The section addresses transactions where the parties intend the goods in question to continue to be the seller's property after the buyer takes possession of them. A common example is the consignment sale, where the buyer's responsibility is to sell the goods on behalf of the seller, or return them if they cannot be sold. Another example arises when the parties intend to postpone the change in ownership until sometime after delivery to allow the buyer an opportunity to decide whether or not to accept the goods. Section 2326 provides a means of distinguishing between these kinds of transactions, explaining that a sale is "on approval" when the goods are intended for the buyer's own use, and is a "sale or return" when the goods are to be resold by the buyer. (*Id.*, subd. (1)(a) & (b).) A "sale on approval" is a bailment that gives the purchaser the right to use and the option to purchase after a reasonable period of time. (*Matter of Prior Bros., Inc.* (1981) 29 Wn.App. 905 [632 P.2d 522, 527–528].)

■ Comment 1 to Uniform Commercial Code section 2-326 elaborates, noting that the types of transaction governed by the section are "strongly delineated in practice and in general understanding," further providing, "Both a 'sale on approval' and a 'sale or return' should be distinguished from other types of transactions with which they frequently have been confused. A 'sale on approval,' sometimes also called a sale 'on trial' or 'on satisfaction,' deals with a contract under which the seller undertakes a risk in order to satisfy its prospective buyer with the appearance or performance of the goods that are sold. The goods are delivered to the proposed purchaser but they remain the property of the seller until the buyer accepts them." (Official Comments on U. Com. Code, Deering's Ann. Cal. U. Com. Code (1999 ed.) foll. § 2326, p. 169.) The ordinary retail sales contract is not a bailment, and the general presumption runs against a delivery to a consumer as being a sale on approval. (E.g., *Direct Marketing Ass'n, Inc. v. Bennet* (E.D.Cal. Jul. 12, 1991, Civ. No. S-88-1067 MLS) 1991 WL 317021, *2; *Gold'n Plump Poultry, Inc. v. Simmons Eng. Co.* (8th Cir. 1986) 805 F.2d 1312, 1319.)

One reason for distinguishing between these types of transactions involves the competing interests of the buyer's creditors and the seller. California Uniform Commercial Code section 2326, subdivision (2) provides: "Goods

held on approval are not subject to the claims of the buyer's creditors until acceptance; goods held on sale or return are subject to such claims while in the buyer's possession." Under plaintiff's interpretation, then, Brawn retains an interest in any goods shipped to its customers, superior to the rights of the customers' creditors, until some time after shipment, when the customers signal their approval of the goods.

It also has been recognized that a common attribute of "sales on approval" is that the obligation to pay for the goods does not arise until the goods have been tested and approved by the buyer. In *Copy Service, Inc. v. Florida Copy Corp.* (1988) 527 So.2d 247, a purchaser argued that the sale of a copy machine was a sale on approval because the seller agreed that it would adjust the copier to the customer's satisfaction or replace it with a new unit. The court rejected the argument. It reasoned that the contract's denomination as an "Equipment and Sales Contract, " and its recitation that the buyer entered an order for the equipment and agreed to pay cash for it, was "wholly inconsistent with a 'sale on approval' transaction." (*Id.* at p. 248.) The court contrasted the contract with another, which was entitled "Demonstration and Trial Contract," under which the purchaser was given the right to use the copier in its business without any obligation to purchase—a transaction the court found to be a "classic embodiment of 'sale on approval.' " (*Ibid.*) In *Buffalo Arms, Inc. v. Remler Co.* (1960) 179 Cal.App.2d 700 [4 Cal.Rptr. 103], the contract was for a sale of equipment on approval where the buyer did not pay for the equipment before, or upon, delivery, and the parties agreed that if, after the end of a 30-day trial period, the buyer decided against purchase, it would return the goods to the seller at no charge to the buyer. (*Id.* at p. 704.) In *Imex Intern., Inc. v. Wires EL* (2003) 261 Ga.App. 329 [583 S.E.2d 117, 122], the court suggested that a "sale on approval" contemplates a transaction allowing the buyer to inspect or test the goods after delivery, before becoming obligated to pay. Brawn's customers paid for their orders before they were shipped and before inspecting them, although they became entitled to a refund of the purchase price if they later decided to return the goods.

While we are not prepared to say that a sale on approval *never* can occur when the buyer pays for the goods before shipment, we think that for such a purchase to be a sale on approval there must be some provision or objective fact demonstrating an intent that, notwithstanding that the buyer has paid for the goods, they do not "belong" to the buyer until the buyer approves them, so that the seller's rights in the goods are superior to the rights of the buyer's creditors until the approval period has passed. That Brawn, or any other retailer, permits a customer to return goods for a refund is a benefit to the customer, but does not in and of itself suggest that the parties intended the seller to retain an interest in the goods until sometime after they are

delivered to the customer, and does not convert a routine sale with a right to return into a sale on approval.

### CONCLUSION

The judgment is reversed. The order awarding litigation expenses and attorney fees is reversed. Brawn is awarded its costs on appeal.

Marchiano, P. J., and Swager, J., concurred.