Filed 9/29/16  P. v. Boegeman CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D068525 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN339497) |
| CHRISTOPHER BOEGEMAN, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Scott C. Taylor, Tami Falkenstein Hennick, and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christopher Boegeman of grand theft. (Pen. Code[1] § 487, subd. (a).) The trial court suspended imposition of sentence and placed Boegeman on three years' formal probation, including 180 days in local custody. Boegeman contends (1) the court violated his Fourteenth Amendment right to due process and Sixth Amendment right to a jury trial by instructing the jury that he could be guilty of theft as an aider and abettor without defining the elements of aiding and abetting; (2) the court violated his Fourteenth Amendment right to due process by instructing the jury on the legally invalid theory that he committed larceny as a direct perpetrator; and (3) the court prejudicially erred by admitting inadmissible hearsay evidence contained in a delivery confirmation document. We affirm.

## FACTS

Boegeman and David Schroeder shared an apartment in Escondido. Boegeman provided caretaking services to Schroeder in exchange for room and board. Their neighbor, Douglas Goll, bought and sold items on eBay for them and kept two percent of the proceeds of the items he sold as a commission. Boegeman and Schroeder told Goll they did not want to sell items in their own names because they did not want to show income that would jeopardize their HUD housing.

In April 2014, Boegeman and Schroeder approached Goll together and discussed buying and selling silver online. Boegeman told Goll that if he did not sign the UPS or FedEx confirmation of delivery slip when silver was delivered, he could claim he had not

---

[1]     All statutory references are to the Penal Code unless otherwise specified.

received it. Schroeder likewise said that by not signing for a delivered item he could claim it was never delivered or was stolen. He said he always claimed his packages were stolen from his apartment. In separate conversations, Boegeman and Schroeder both told Goll that by not signing for purchased products, a person could either get a refund and keep the product or get a duplicate and have two products. Boegeman said he once signed his name as Mickey Mouse.

Following those conversations, Boegeman and Schroeder asked Goll to bid on a set of silver on eBay. When the price reached about $3,850, Goll asked Schroeder for the money to purchase the silver at that price. Schroeder used Boegeman's credit card to pay for the silver. eBay initially accepted the card, but later cancelled the transaction.

In April 2014, Schroeder called Dean Gannon to inquire about a set of sterling silver flatware that Gannon's family antique business was marketing on eBay. After an extensive conversation, Gannon agreed to sell the silver to Schroeder for approximately $8,145 and ship it to him. Schroeder paid for the silver with a Visa credit card and Gannon entered the card number into his register machine. The charge was accepted and Gannon shipped the silver to Schroeder through FedEx. The delivery address was Schroeder's apartment, 1121 Morning View Drive, Apartment 205 in Escondido. Gannon purchased insurance for the shipment from FedEx that would reimburse him up to $1000 plus the cost of shipping if the shipment were lost or damaged.

FedEx driver Steven Milner delivered the package containing the silver to Schroeder and Boegeman's apartment on April 26, 2014. When Milner knocked on the door, Boegeman opened the door and signed for the package. He identified himself as

David Schroeder. Because Boegeman stated the full name of the addressee on the package and Milner was at the specified delivery address, Milner did not ask Boegeman for identification. Milner testified that there was another man in the apartment "just sitting there in the background." Milner remembered having a brief conversation with Boegeman in which Milner complained about having to work on a Saturday and Boegeman responded, "At least you have a job." Milner had seen Boegeman on prior occasions when he made deliveries but had never spoken with him before April 26, 2014.

Sometime after April 26, 2014, Schroeder called his credit card company and reported that he had not received the silver he ordered from Gannon. Consequently, Visa reversed the charge and withdrew the money that had been paid into Gannon's account for the silver. Gannon then opened a fraud claim with FedEx and collected insurance proceeds from FedEx of $1000 plus the cost of shipping the silver.

Gannon also called investigator Scott Tolstad of the Escondido Police Department regarding the possible theft of the silver he had shipped to Schroeder. Tolstad contacted a FedEx investigator who told him Milner was the driver who delivered the silver to Schroeder and Boegeman's address. When Tolstad initially contacted Milner by phone, Milner told Tolstad he remembered making the delivery and thought he would be able to identify the person who accepted the package. Tolstad later showed Milner a "six-pack" of DMV photographs. One of the six photographs was of Boegeman and the other five were of similar looking men. Milner circled the photograph of Boegeman and noted on the six-pack that he recognized Boegeman from the delivery on Morning View Drive. Milner told Tolstad that Boegeman was the person who signed for the package.

4

At trial, Milner testified that a week or two after he delivered the silver to Boegeman, he made another delivery to the same address but "[i]t was a totally different name." The first two times he attempted to make the delivery, there was a note on the door instructing him to "take it to somewhere else." Milner "didn't feel safe in doing that," so he made a third attempt to deliver it to Schroeder and Boegeman's apartment. On the third attempt, the other man Milner had seen in the apartment on April 26 opened the door. Milner told the man he need to see identification before he would release the package. At that point "the other gentleman came up and was angry that [Milner] wouldn't let him sign for it." Both men refused to show identification and one of them eventually closed the door on Milner because he refused to release the package.

Boegeman testified at trial that he and Schroeder left Escondido on Friday, April 25, 2014, and did not return to their apartment until around 11:00 p.m. on Sunday, April 27, 2014. They spent the weekend going to yard sales in Pasadena and Long Beach and helping their friend Tanya Williams-Mahee buy merchandise to sell at swap meets. Williams-Mahee also provided caretaking services to Schroeder. Before they left on Friday, their upstairs neighbor Cynthia Omey asked them to watch her dog for the weekend. Boegeman told her they could not watch the dog because they had other plans for the weekend.

Boegeman testified that he first encountered Milner a couple of months before the weekend of April 26, 2014, and had two other encounters with Milner before that weekend. In the first encounter he asked Milner to leave packages at the rental office for the apartment complex and to stop leaving them on Boegeman's patio or door. Milner

5

responded that it was "none of [Boegeman's] effing business to tell him how to do his job. If he [had] a problem, take it up with corporate."

The second encounter was a "screaming match." Boegeman told Milner he was "getting really tired of [his] packages coming up missing and seeing these signs saying that [Milner] delivered something when it was never there. And being accused of something." Boegeman asked Milner multiple times to leave deliveries at the rental office. Milner said that was not his job. "His job is to throw it there and keep going. He doesn't care."

In the third encounter, Boegeman complained to Milner about a package that "never showed up." Milner said that he had left the package and that Boegeman was ignorant. Boegeman responded, "[W]ell, if you weren't working, we should step outside and handle this because I'm missing packages that, you know, belong to me and I have paid and I use." Boegeman called FedEx "corporate" and discussed the matter with them. Boegeman testified that he and Schroeder had lost about $10,000 worth of missing items as a result of FedEx's misplacing their packages throughout the years.

Schroeder testified that he was with Boegeman and Williams-Mahee in Los Angeles the weekend of April 25, 2014.[2] The silver he purchased from Gannon was supposed to have been delivered that Saturday. On Monday, Schroeder called FedEx and was told the package had been delivered next door. He went next door with Williams-

---

[2]    Schroeder testified that "LA is one big area to me[,]" and that "[a]nything past Disneyland is LA."

Mahee, but the package was not there. He then called his credit card company and was told they would contact Gannon to determine whether he would refund Schroeder's money because Schroeder had not received the merchandise. Schroeder never got the silver. Regarding Boegeman's previous conflict with a delivery man, Schroeder testified that a FedEx delivery man was not nice to him, and he thought "that's what made [Boegeman] mad. It also made [the FedEx driver] mad. He was nasty the way he responded."

Williams-Mahee testified that she was in Los Angeles on the 25th, 26th, and 27th of April 2014 and was shopping in downtown Los Angeles with Boegeman and Schroeder on Saturday the 26th around 4:00 to 6:00 p.m. They went their separate ways Saturday night and did not see each other again until Sunday evening, when they met before driving back to Escondido.

Omey, whose apartment was above Schroeder and Boegeman's apartment, testified that a couple of days before April 25, 2014, she asked Boegeman and Schroeder if they would watch her dog over the coming weekend because she and her husband were going to be visiting their daughter in Pasadena over the weekend. They told her they could not watch her dog because they were also going to be in Pasadena. Around 6:00 to 6:30 a.m. on Saturday, April 26, Omey rattled the doorknob to Schroeder and Boegeman's apartment to make sure it was locked before she left for Pasadena. The door was locked and no one came to the door. When she returned on Sunday evening, there was an unsigned "Post-it-type" note on her door from FedEx that read, "I left a package

7

for Apartment No. 105. You signed for it!" The note was underscored several times. Omey gave the note to Schroeder.

To rebut Boegeman's alibi defense, the prosecution called Don Holmes, an investigator for the San Diego County District Attorney's Office, to testify as an expert on cellphone records and technology. He explained that a phone company always knows where a phone is being used because the "phone is always sending and receiving radio signals from cellphone towers that [the] carrier has set up throughout the general geographical area that [the user] lives in." Holmes analyzed records of calls made from and received by Boegeman's cellphone between April 25 and April 27, 2014. He testified and presented a power point presentation showing that all of the phone's outgoing and incoming calls during that time period connected to cellphone towers in the Escondido area or Temecula area. The phone did not make or receive any calls in the Los Angeles area.

In surrebuttal Boegeman testified that the cellphone in question was not in his possession from April 25 through April 27, 2014. He left the phone with a neighbor that weekend who had asked him if she could use it to contact her son. He did not recognize any of the phone numbers listed in Holmes's power point presentation.

DISCUSSION

I. *Failure to Instruct on Aiding and Abetting*

Boegeman contends the court violated his Fourteenth Amendment right to due process and Sixth Amendment right to a jury trial by instructing the jury that he could be guilty of theft as an aider and abettor but not further instructing on the elements of aiding

8

and abetting.  The court instructed the jury regarding Boegeman's alibi defense with a modified version of CALCRIM No. 3400 as follows:

> "The People must prove the defendant committed grand theft in violation of Penal Code section 487 (a) as charged in Count 1.  The defendant contends he did not commit this crime and he was somewhere else when the crime was committed.  The People must prove the defendant was present and committed the crime with which he is charged.  The defendant does not need to prove he was elsewhere at the time of the crime.
>
> "If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find him not guilty.
>
> "*However, the defendant may also be guilty of grand theft in violation of Penal Code section 487[, subdivision] (a) as charged in Count 1 if he aided and abetted or conspired with someone else to commit that crime.  If you conclude that the defendant aided and abetted or conspired to commit grand theft, then he is guilty even if he was not present when the crimes were committed*."  (Italics added.)

With the italicized language above, the court instructed the jury that it could convict Boegeman of theft as an aider and abettor, but the court did not instruct the jury on the requirements for aider and abettor liability, including the requirement of criminal intent.[3]

The People acknowledge that a court's failure to properly instruct the jury on the elements of aiding and abetting is subject to review under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

---

[3]    An appropriate instruction on aiding and abetting "should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator, and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."  (*People v. Beeman* (1984) 35 Cal.3d 547, 561; see CALCRIM No. 401.)

9

(*People v. Reyes* (1992) 2 Cal.App.4th 1598, 1601-1602; *People v. Sarkis* (1990) 222 Cal.App.3d 23, 28-29.) Under that standard, error is harmless if the reviewing court determines beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Aranda* (2012) 55 Cal.4th 342, 367.) "When there is ' "a reasonable possibility" ' that the error might have contributed to the verdict, reversal is required." (*Ibid.*)

We conclude that to the extent the court erred by referencing aiding and abetting in its alibi-defense instruction without defining the elements of aiding abetting, the error was harmless beyond a reasonable doubt—i.e., there is no reasonable possibility that Boegeman would have obtained a more favorable verdict on the grand theft charge had the court defined the elements of aiding and abetting in connection with its alibi instruction. The prosecution specifically informed the jury that its theory was conspiracy, and the court correctly and specifically instructed the jury on necessary mental state and acts to support a finding that Boegeman was guilty of theft by false pretenses as a member of a conspiracy with Schroeder.[4] The prosecutor did not argue or even mention aiding and abetting to the jury. Boegeman's main defense was not ignorance of any criminal scheme to steal Gannon's silver, but rather that he and Schroeder were not home

---

[4] The court's conspiracy instruction informed the jury that to prove Boegeman of theft as a member of a conspiracy, the People had to prove that Boegeman "intended to and did agree with David Schroeder to commit theft by false pretenses[,]" and that Boegeman and Schroeder "committed at least one of the following overt acts to accomplish theft by false pretenses: [¶] 1) Ordered silverware from Dean Gannon without an intent to pay; [¶] 2) Received the delivered silverware but claimed never to have received it; [¶] 3) Withdrew payment for the silverware despite having received it."

10

on the date the evidence shows the silver was delivered to their residence. As the People note in their brief, during closing arguments the prosecutor and defense counsel collectively presented the jury with two possibilities: either Boegeman conspired with Schroeder to steal the silver or he was entirely innocent.

The jury obviously rejected Boegeman's and Schroeder's alibi evidence that they were in the Los Angeles area on April 26, 2014, and found credible Milner's testimony and the other evidence that Milner delivered the silver to Schroeder and Boegeman's address that day and Boegeman signed for the delivery. Goll's testimony that Boegeman previously had explained to him the criminal scheme of ordering silver, not signing a confirmation of delivery slip when silver was delivered, and then claiming the silver had not been delivered eliminates any reasonable possibility that a juror might have had reasonable doubt as to whether Boegeman conspired with Schroeder to steal Gannon's silver and signed for the delivery of the silver with the intent of stealing it.

We conclude that given the evidence in this case, no rational juror properly instructed on the elements of aiding and abetting would have found that Boegeman did not know Schroeder intended to commit theft by false pretenses, or that he knew of Schroeder's criminal purpose but did not sign for the silver with the intent of helping committing, facilitating, or encouraging Schroeder's commission of the crime. There was simply no evidence to support a finding that Boegeman was ignorant of any plan to steal Gannon's silver by receiving it and then claiming it was not delivered. Accordingly, any error by the court in failing to instruct the jury on the elements of aiding and abetting was harmless beyond a reasonable doubt.

11

II.  *Theft by Larceny Theory*

Boegeman contends the court violated his Fourteenth Amendment right to due process by instructing the jury on the invalid theory that he committed theft by larceny as a direct perpetrator.  Boegeman argues that because Gannon was not the legal owner of the silver when Boegeman allegedly signed for and received the silver, theft by larceny is a legally invalid theory.[5]

We independently review issues relating to the validity of jury instructions. (*People v. Burch* (2007) 148 Cal.App.4th 862, 870.)  The court instructed the jury on theft by larceny in accordance with CALCRIM No. 1800 as follows:  "To prove that the defendant is guilty of [theft by larceny], the People must prove that:  [¶]  1.  The defendant took possession of property owned by someone else;  [¶]  2.  The defendant took [the] property without the owner's or owner's agent's consent;  [¶]  3.  When the defendant took the property he intended to deprive the owner of it permanently or to

---

5       Boegeman's claim of error challenges not so much the theory that he was a direct perpetrator as the theory that he committed a theft by larceny.  As noted, the People's respondent's brief in places expresses the view that Boegeman's participation in the alleged conspiracy to commit theft by false pretenses made him a direct perpetrator.  For example, the People state that "the prosecutor only argued that appellant was a direct perpetrator[,]" and that "[t]he trial record demonstrated that appellant acted—and was only prosecuted—as a direct perpetrator."  However, the People in other places differentiate between Boegeman's being a conspirator and a direct perpetrator, for example stating that "[t]he prosecutor only argued and presented evidence that appellant was a direct perpetrator of theft by larceny or that he conspired with Schroeder to commit theft by false pretenses[,]"and that "[t]he prosecutor only argued that appellant was either a direct perpetrator or a conspirator[.]"

remove it from the owner['s] or owner's agent's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property; [¶] 4. The defendant moved the property, even a small distance, and kept it for any period of time, however brief."

The court also instructed the jury on theft by false pretenses in accordance with CALCRIM No. 1804, in relevant part, as follows: "The defendant is charged in Count 1 with grand theft by false pretense in violation of Penal Code section 487. [¶] To prove the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant knowingly and intentionally deceived a property owner or the owner's agent by false or fraudulent representation or pretense; [¶] 2. The defendant did so intending to persuade the owner or the owner's agent to let the defendant or another person take possession and ownership of the property; [¶] AND [¶] 3. The owner let the defendant or another person take possession and ownership of the property because the owner or the owner's agent relied on the representation or pretense."

The theory that Boegeman committed theft by larceny is invalid because the trial evidence supported only the prosecution's main theory that Boegeman participated in a theft by false pretenses. Because the crime of theft by false pretenses was completed before the silver was delivered to Boegeman and Schroeder, the silver could not later become the subject of a theft by larceny upon delivery.

In *People v. Williams* (2013) 57 Cal.4th 776 (*Williams*), the California Supreme Court explained that "*theft by false pretenses,* unlike larceny, has no requirement of asportation. The offense requires only that '(1) the defendant made a false pretense or

13

representation to the owner of property; (2) with the intent to defraud the owner of that property; and (3) the owner transferred the property to the defendant in reliance on the representation.' [Citation.] *The crime of theft by false pretenses ends at the moment title to the property is acquired . . . .*" (*Id.* at p. 787, second italics added.) Consequently, a completed theft by false pretenses "cannot become robbery by the defendant's later use of force or fear." (*Ibid.*)

In this case, the theft by false pretenses ended the moment title to the silver passed to Schroeder. Under the law governing shipment contracts, title passed to Schroeder when Gannon shipped the silver. California Uniform Commercial Code section 2401, subdivision (2) provides, in part, that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . and in particular . . . [¶] (a) If the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but [¶] (b) If the contract requires delivery at destination, title passes on tender there." "Thus, when the parties agree to or contemplate shipment by the seller, title passes to the buyer upon that shipment, unless the agreement specifically requires the seller to make delivery at the destination." (*California State Electronics Assn. v. Zeos International Ltd.* (1996) 41 Cal.App.4th 1270, 1277.)

A contract under which the seller takes a telephone order and ships the goods at the buyer's expense, like Schroeder's contract to purchase silver from Gannon, is

14

presumptively a shipment contract.[6] (*California State Electronics Assn. v. Zeos International Ltd.*, *supra*, 41 Cal.App.4th at p. 1277.) A shipment contract is regarded as the normal contract under the Uniform Commercial Code; a destination contract is the regarded as the variant type. (*Wilson v. Brawn of California, Inc.* (2005) 132 Cal.App.4th 549, 555 (*Wilson*).) " 'The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, unless he has specifically agreed so to deliver or the commercial understanding of the terms used by the parties contemplates such a delivery.' " (*Ibid.*, quoting Official Comments on U. Com. Code, Deering's Ann. Cal. U. Com. Code (1999 ed.) foll. § 2503, p. 198.)[7]

There was no evidence at trial indicating the contract between Gannon and Schroeder for the purchase of Gannon's silver was anything other than a standard shipping contract, under which title to the silver passed to Schroeder when Gannon shipped the silver. Thus, the uncontroverted evidence established that when Gannon shipped the silver the theft by false pretenses was complete. The crime could not later become a theft by larceny when a perpetrator of the theft by false pretenses received and asported the stolen property.

---

[6] Gannon testified that the total price he charged Schroeder for the silver included shipping.

[7] The *Wilson* court noted: "Of course, a seller will have to provide the carrier with shipping instructions. It follows that a contract is not a destination contract simply because the seller places an address label on the package, or directs the carrier to 'ship to' a particular destination. 'Thus a "ship to" term has no significance in determining whether a contract is a shipment or destination contract for risk of loss purposes.' " (*Wilson, supra,* 132 Cal.App.4th at p. 155.)

*Williams* discussed "another significant difference between larceny and theft by false pretenses. . . . [L]arceny requires a 'trespassory taking,' which is a taking without the property owner's consent. [Citation.] . . . By contrast, theft by false pretenses involves the *consensual* transfer of possession as well as *title* of property; therefore, it cannot be committed by trespass." (*Williams, supra,* 57 Cal.4th at p. 788.) *Williams* added that "unlike the offense of larceny by trick, in which a defendant's fraud vitiates the consent of the victim as a matter of law, the acquisition of title involved in the crime of theft by false pretenses precludes a trespass from occurring." (*Williams, supra,* 57 Cal.4th at pp. 788-789, citing and discussing *People v. Beaver* (2010) 186 Cal.App.4th 107, 121 (*Beaver*) [in trial of defendant convicted of grand theft for staging an accident at his place of employment to obtain medical expenses for a preexisting injury, it was reversible error to instruct the jury on theft by larceny instead of theft by false pretenses because the employer consented to pay for the defendant's medical treatment; therefore the defendant did not commit a trespassory taking, and hence did not commit larceny].)

In the present case, there was no trespassory taking because Schroeder's acquisition of title precluded a trespassory taking from occurring. In the words of the *Beaver* court, "Notwithstanding the fact the offense of theft by false pretenses, like all other theft offenses, has been consolidated into the single crime of theft as defined in section 484, the essential elements of the individual theft offenses remain the same. [Citation.] The present matter did not involve a taking of property from another without his consent. . . . This was theft by false pretenses, not larceny." (*People v. Beaver, supra,* 186 Cal.App.4th at p. 121.)

16

The evidence in this case supports only the crime of theft by false pretenses, which was completed when Gannon shipped the silver. It was not possible for Boegeman to commit theft by larceny against Gannon when the silver was delivered because Gannon had relinquished both possession and title. The only possible way Boegeman's taking of the silver from Milner could be a theft by larceny would be if Boegeman had taken the package with the intent to steal it from *Schroeder.* However, the prosecution clearly did not proceed on that theory and did not present any evidence that Boegeman stole the silver from Schroeder or anyone else other than Gannon.

This raises the question of whether the theft by larceny theory and jury instruction was a *legally* invalid theory, as Boegeman argues, or merely a *factually* invalid theory. We conclude the theft by larceny instruction was factually invalid rather than legally invalid. In *People v. Perez* (2005) 35 Cal.4th 1219, 1233 (*Perez*), the California Supreme Court explained: "The nature of . . . harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory. When one of the theories presented to a jury is legally inadequate, such as a theory which ' "fails to come within the statutory definition of the crime" ' [citations], the jury cannot reasonably be expected to divine its legal inadequacy. The jury may render a verdict on the basis of the legally invalid theory without realizing that, as a matter of law, its factual findings are insufficient to constitute the charged crime. In such circumstances, reversal generally is required unless 'it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on a proper theory.' [Citation.]

17

"In contrast, when one of the theories presented to a jury is factually inadequate, such as *a theory that, while legally correct, has no application to the facts of the case*, we apply a different standard. [Citation.] In that instance, we must assess the entire record, 'including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict.' [Citation.] We will affirm 'unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory.' " (*Perez, supra,* 35 Cal.4th at p. 1233, italics added.)

In *People v. Guiton* (1993) 4 Cal.4th 1116 (*Guiton*), the California Supreme Court explained: "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, . . . the . . . rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Id.* at p. 1129.)

Here, the improperly presented theft by larceny theory was not *legally* invalid— i.e., it was not a case where the facts do not state a crime under the applicable statute. The jury could apply the facts of the delivery literally to the larceny instruction and conclude the elements of larceny were satisfied, not knowing that Boegeman's taking the package from Milner could not constitute a theft by larceny from Gannon because

18

Gannon consented to pass title to Schroeder, and the crime of theft by false pretenses was complete when he did so by shipping the silver.

The larceny theory presented in this case is more accurately viewed as being "factually inadequate"—i.e., "a theory that, while legally correct, has no application to the facts of the case . . . ." (*Perez, supra,* 35 Cal.4th at p. 1233.) The prosecutor in closing argument told the jury there were two theories of theft and stated: "Now, these two theories are theft by larceny and theft by false pretenses. *The one that's supported by the evidence is theft by false pretenses.* But you can also get to theft by larceny."[8] (Italics added.) Thus, the prosecutor essentially admitted in the italicized statement that the theory of theft by larceny was factually inadequate.

Error in giving an instruction that is a correct statement of law but has no application to the facts of the case is an error of state law subject to the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*Guiton, supra,* 4 Cal.4th at pp. 1129-1130.) "Under *Watson*, reversal is required if it is reasonably probable the result would have been more favorable to the defendant had the error not occurred." (*Guiton,* at p. 1130.) In cases where the jury was presented a factually inadequate theory along with one or more factually adequate theories, "the appellate court should affirm the judgment unless a review of the entire record affirmatively

---

8    The prosecutor told the jury they did not have to agree on the theory of theft, only that a theft happened.

demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Ibid.*)

Our review of the entire record compels the conclusion that presentation of the factually invalid larceny theory was not prejudicial under the *Guiton* test because it is not reasonably probable that the jury found the Boegeman guilty on solely that theory. It is far more likely that the jury convicted him as a conspirator in a theft by false pretenses, which was the prosecution's main theory. As the prosecutor correctly stated in closing argument, "The [theory] that's supported by the evidence is theft by false pretenses."[9]

III. *Admission of the FedEx Delivery Confirmation Document*

Boegeman contends the trial court abused its discretion in admitting the FedEx document showing the delivery of Gannon's silver to Schroeder and Boegeman's residence under the business records exception to the hearsay rule. We disagree.

When the prosecutor initially introduced the FedEx confirmation of delivery document during his examination of Gannon, Boegeman's counsel objected on the grounds of lack of foundation, speculation, and hearsay. The court sustained "the objection" pending further argument on the admissibility of the document in chambers. Later in chambers, the court stated the document "qualifies as a business record assuming foundation can be laid for it." Defense counsel objected that the document did not qualify as a business record under Evidence Code section 1271. The prosecutor argued

---

9 The prosecutor's argument regarding theft by false pretenses spans nine pages of the reporter's transcript; his argument regarding theft by larceny covers less than one page.

20

the document had been authenticated by Gannon and was "not being offered for the truth of the matter asserted." The court allowed the prosecutor to introduce the document and stated that the jury could determine whose signature was on the document.

We review the trial court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Riggs* (2008) 44 Cal.4th 248, 290.) A trial court has "wide discretion in determining whether sufficient foundation is laid to qualify evidence as a business record. On appeal, evidence of that discretion can be overturned only upon a clear showing of abuse." (*People v. Lugashi* (1988) 205 Cal.App.3d 632, 638-639.)

We conclude the court acted within its discretion in admitting the delivery confirmation document under the business records exception to the hearsay rule. Evidence Code section 1271 provides that "[e]vidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if: [¶] (a) The writing was made in the regular course of a business; [¶] (b) The writing was made at or near the time of the act, condition, or event; [¶] (c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and [¶] (d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

After Gannon testified that the delivery confirmation document was the one he received from FedEx, Milner testified that he recognized the document as a printout of the signature that was given to him for the package he delivered to Schroeder and Boegeman's apartment on April 26, 2014, and that information on the document was contained in his PDA (personal digital assistant device). The information included the

21

delivery address and the date and time the delivery was made.[10] Milner testified that the information on a delivery confirmation document is automatically entered into his PDA as soon as he scans a package upon delivery.

Milner's testimony about the subject delivery confirmation document satisfied the requirements of Evidence Code section 1271. Milner's testimony established that the document was made in the regular course of his business as a FedEx delivery driver, and that the document was created at the time of the delivery of the package in question to Boegeman and Schroeder's apartment. Milner was qualified to testify about the identity of the document and the mode of its preparation, and his testimony about the source of the information on the document and method and time of the document's preparation (scanning the package with his PDA upon delivery) was sufficient to indicate the document's trustworthiness. (See *Dauenhauer v. Columbia River Bank* (D. Or., Feb. 22, 2012, No. 3:11-CV-1436-ST) [2012 U.S. Dist. LEXIS 57966] [because confirmation receipts from the United States Postal Service are routinely admitted under the public agency record exception to the hearsay under federal rules of evidence, "[d]elivery confirmation receipts from businesses performing similar functions to the USPS, such as FedEx or UPS, also should be sufficiently trustworthy to be admissible."].) The court did not abuse its discretion in admitting the delivery confirmation document under the business records exception to the hearsay rule.

---

10    The delivery confirmation document identifies "David Schroeder" as the recipient of the package and states "Signed for by: DSHROEDER [*sic*]." The signature on the document is illegible.

DISPOSITION

The judgment is affirmed.


                                                                    O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


NARES, J.