Filed 1/27/23 Newport Fab. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NEWPORT FAB, LLC,<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>UPTOWN NEWPORT JAMBOREE, LLC,<br><br>    Real Party in Interest. | G061466<br><br>(Super. Ct. No. 30-2018-00973247)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Theodore Howard, Judge. Petition denied.

Keller/Anderle, Jennifer Keller, Nahal Kazemi, Anand R. Sambhwani; Skadden, Arps, Slate, Meagher & Flom, Jason D. Russel, Hillary A. Hamilton and Adam K. Lloyd for Petitioner.

No appearance for Respondent.

Callahan & Blaine, Edward Susolik, Michael J. Sachs, Peter S. Bauman and James M. Sabovich for Real Party in Interest.


\*       \*       \*


INTRODUCTION

Trial by jury is a cherished right, and for civil cases is protected by the California Constitution, article I, section 16. But the right to a jury trial in a civil matter extends only to questions of fact: The court must try issues of law, and they must be decided first. Those principles guide our decision in this matter.

Petitioner Newport Fab, LLC doing business as Jazz Semiconductor (Jazz) contends the respondent court denied it the right to a jury trial of a declaratory relief cause of action brought by real party in interest Uptown Newport Jamboree, LLC (Uptown). That cause of action sought a declaration that Jazz, as the lessee, had breached provisions of a lease, amendments to the lease, and municipal code sections relating to noise level standards and sound mitigation applicable to the real property subject to the lease. Uptown, the lessor, moved to "trifurcate" trial, with the first phase to be a bench trial on the declaratory relief cause of action. The respondent court granted Uptown's motion and in doing so stated it first would determine "what . . . the contract provide[s] for in terms of a standard of sound attenuation for the Leased Premises."

Jazz filed a petition for writ of mandate to challenge the respondent court's order granting Uptown's motion to trifurcate. Jazz contends the respondent court's order denied it the right to trial by jury because Uptown's declaratory relief cause of action is, in effect, a breach of contract claim for which Jazz has a right to trial by jury.

We agree with Jazz that the declaratory relief cause of action really is a substitute for a breach of contract cause of action, an action at law for which Jazz would be entitled to a jury trial. But we do not construe the respondent court's order as severing

2

the entire declaratory relief cause of action: We construe the order only as severing issues regarding interpretation of provisions of the lease, amendments to the lease, and municipal code sections, and other agreements and measures in order to determine the noise level standards and sound mitigation applicable to Jazz's operations on the leased property.

So, construing the order, we deny Jazz's petition for writ of mandate. Interpretation of a contract, including an ambiguous one, is always a question of law for the court unless interpretation turns on resolving conflicts in competent and relevant extrinsic evidence. Jazz has not demonstrated that any lease interpretation issue requires the resolution of such conflicts. Interpretation of statutes, which include municipal ordinances, is without exception a question of law, while application of a statute to a given set of facts is a question of law unless those facts are in material dispute. Jazz is not entitled to a jury trial on issues of law; to the contrary, issues of law must be decided by the court and must be decided first. The court has discretion to sever issues of law and conduct a bench trial on them before submitting factual questions to a jury. The respondent court did not abuse that discretion by ordering severance of legal issues in the declaratory relief cause of action.

FACTS

I. *We Accept the Well-pleaded and Verified Allegations of Jazz's Writ Petition as True*

When, as in the present case, the Court of Appeal issues an order to show cause, the real party in interest may file "a return by demurrer, verified answer, or both." (Cal. Rules of Court, rule 8.487(b)(1).) Uptown did not file a true return. Uptown's return is a brief that does not answer or demur to the allegations of Jazz's writ petition.

A potential consequence for filing a return that neither answers nor demur to the allegations of a writ petition is to strike the return and decline to consider it. (*Agricultural Labor Relations Bd. v. Superior Court* (2016) 4 Cal.App.5th 675, 681;

3

*Bank of America N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1084.) That is, of course, what Jazz has asked us to do. We decline to take that approach. Instead, we adopt the "less catastrophic" approach of deeming the well-pleaded and verified allegations of the writ petition to be true and treat the return as a demurrer. (*Agricultural Labor Relations Bd.*, at p. 682; see *Ashmus v. Superior Court* (2019) 42 Cal.App.5th 1120, 1124, fn. 4 [treating return as a demurrer].)

This does not mean we accept all of Jazz's allegations to be true. To be accepted as true, the allegations must be well-pleaded *facts* — not argument or legal propositions — and must be properly verified, meaning the person verifying the allegations must have personal knowledge of them. For those reasons, we decline to accept as true the following allegations in Jazz's writ petition: Paragraph 8, the word "indisputably"; paragraph 10, the word "repeatedly"; paragraph 11, the phrase "rife with allegations"; paragraph 12, the first three lines; paragraph 13, the word "repeatedly"; paragraph 15, the word "baldly"; paragraph 16, the phrase "In light of Uptown's assertions" and the entire second sentence; paragraph 17 the word "repeatedly"; paragraph 18, the phrases "The same was true at the summary judgment stage," "adopted Uptown's arguments," and "went on to hold, again adopting Uptown's arguments"; paragraph 19, the last sentence; paragraph 20, the phrase, "Confronted with the prospect of a looming jury trial"; paragraph 21, the phrase "Uptown's untimely and procedurally improper"; paragraph 22, the first two lines; paragraph 23, the phrase "went on to hold" which will construe as "stated"; paragraph 26 the word "holding"; paragraph 28 the word "held"; paragraph 29, the phrase "the Superior Court expressed confusion"; paragraphs 31, 32, 33, 34 in their entirety; paragraph 35, the first and last sentences; paragraph 36 in its entirety; paragraph 37, in its entirety except for the first sentence; paragraph 38, in its entirety except for the first sentence; paragraph 39, the word "timely" and the citations to authority.

4

II. *The Lease and The Seventh Lease Amendment*

Uptown is the landlord and Jazz is the tenant under a lease of real property in the City of Newport Beach (the Lease). Jazz owns and operates a semiconductor fabrication factory (the TowerJazz facility) on the property subject to the Lease (the Leased Premises).

In February 2013, Uptown obtained entitlements from the City of Newport Beach (the City) to develop a 25.05-acre parcel into a planned community (the Uptown Development) to include about 1,244 residential units, 11,500 square feet of retail commercial space, and 2.05 acres of public parks. The Leased Premises occupy what would become a portion of phase 2 of the residential development.

In October 2013, Uptown and Jazz entered into a seventh amendment to the Lease (the Seventh Lease Amendment) to address, among other things, sound mitigation. Recital C to the Seventh Lease Amendment states, in part: "The parties recognize that the area of [the] City . . . in which the Leased Premises are located has been subject to significant urbanization over the last decade and this trend is anticipated to continue over the next several years. As part of the urbanization trend, (1) the properties adjacent to and in the immediate vicinity of the Leased Premises are in the process of being converted to predominantly residential and supporting retail uses . . . , and (2) the City . . . recently adopted the Uptown Newport Community Plan."

The Seventh Lease Amendment recites that Jazz's occupancy under the Lease is subject to three limitations on exterior noise levels generated by Jazz's manufacturing activities: (1) A recorded sound mitigation agreement (a private restriction encumbering the Leased Premises); (2) the City's Municipal Code (NBMC); and (3) Mitigation Measure 10-3 contained in a Mitigation Monitoring and Reporting Program adopted by the City.

At the crux of this proceeding is the meaning of the following recital in the Seventh Lease Amendment: "Tenant [Jazz] in consultation with Landlord [Uptown], has

5

agreed to implement sound mitigation measures (the "*Sound Mitigation Measures*") so as [to] reduce the loudness of sounds generated from the Leased Premises (including the noise generated by the Cooling Towers), so as to be fully compliant with all applicable Maximum Permitted Noise Levels, but in all events so that the exterior noise levels do not exceed 65 decibels (A-weighted), measured at the common boundaries of the El Capitan Property and the Half Dome Property (the "*Sound Mitigation Work*")." (Boldface omitted.)

III. *Relevant Noise Level Limitations*

As mentioned, the Seventh Lease Amendment recites that Jazz's occupancy under the Lease is subject to three noise level limitations:

1. The Sound Mitigation Agreement. The sound mitigation agreement required, among other things, that noise generated by Jazz not exceed 60 dBA as measured at the entrance to the office building at 4220 Von Karman Avenue. The abbreviation "dBA" means "A-weighted" decibel. A decibel level that has been "A-weighted" deemphasizes low and high frequencies to better correspond with the subjective reactions of people to noise.

2. The NBMC. Under section 10.26.025(B) of the NBMC, "[i]t is unlawful for any person at any location within the incorporated area of the City to create any noise, or to allow the creation of any noise on property owned, leased, occupied or otherwise controlled by such person, which causes the noise level when measured on any other property, to exceed either of the following: [¶] 1. The noise standard for the applicable zone . . . ." (NBMC, § 10.26.025(B)(1).)

The NBMC creates four noise zones. Relevant here are zones III and IV. Noise zone III is "[t]he residential portion of mixed-use properties." Noise zone IV is "[a]ll manufacturing or industrial properties." (NBMC, § 10.26.020.)

6

NBMC section 10.26.025(A) sets permissible exterior noise levels based on noise zone. Under the NBMC, exterior noise levels in zone III may not exceed exterior noise levels of 60 dBA Leq between 7:00 a.m. and 10:00 p.m., or 50 dBA Leq between 10:00 p.m. and 7:00 a.m., for residential portions of mixed-use properties. (*Ibid*.) The abbreviation "Leq" stands for "energy average noise level." (*Ibid*.) It is the steady noise level which has the same total sound energy as the actual, fluctuating noise levels over the relevant time period. (NBMC, § 10.26.010.) Noise levels in zone IV areas may not exceed 70 dBA between 7:00 a.m. and 10:00 p.m., or 70 dBA Leq between 10:00 p.m. and 7:00 a.m. (NBMC, § 10.26.025(A).) "If the measurement location is on a boundary between two different noise zones, the lower noise level standard applicable to the noise zone shall apply." (NBMC, § 10.26.025(E).)

NBMC section 10.26.090(A) states: "In circumstances [in] which adopted community-wide noise standards and policies prove impractical in controlling noise generated from a specific source, the City Council may establish a noise abatement program which recognizes the characteristics of the noise source and affected property and which incorporates specialized mitigation measures."

A core issue in this litigation is whether the TowerJazz facility and the Leased Premises are subject to noise zone III or noise zone IV noise level limitations. Uptown claims it is zone III; Jazz claims it is noise zone IV.

3. Mitigation Measure 10-3. Mitigation Measure 10-3 was adopted by the City specifically for the Uptown Newport Project as part of the Uptown Newport Mitigation Monitoring and Reporting Program. Mitigation Measure 10-3 provides, in part: "Prior to issuance of building permits for Phase I, a detailed acoustical study . . . shall be prepared . . . and submitted to the Community Development Department for review and approval. The study shall demonstrate that all residential units would meet the 65 dBA CNEL exterior noise standard for all patios, balconies, and common outdoor living areas (playgrounds, parks, and swimming pools). The necessary noise reduction

may be achieved by implementing noise control measures at the TowerJazz facility and at the receiver locations. . . . The measures described about, or some combination thereof, would reduce the exterior noise levels at units facing the TowerJazz facility to 65 dBA CNEL. The property owner/developer shall implement these noise control measures at the TowerJazz facility and demonstrate with noise level measurements that noise from the operation of mechanical equipment at the TowerJazz facility would not exceed 65 dBA CNEL at the property boundary or at the nearest receptors."

IV. *The Eighth Lease Amendment and Completion of Sound Mitigation Work*

Under the terms of the Seventh Lease Amendment, Jazz agreed to perform and complete the sound mitigation work by September 30, 2015. Uptown agreed "to defer declaring a breach of the Lease by reason of any possible noise violation and from exercising it remedies under the Lease, in exchange for [Jazz]'s agreement to fully and satisfactorily pursue and complete each stage of the Sound Mitigation Work by the applicable Performance Date." The Seventh Lease Amendment stated, "Tenant's failure to accomplish the required portion of the Sound Mitigation Work as described above by the applicable Performance Date for such portion, will constitute a material, non-curable breach of the Lease, entitling Landlord to declare a termination of the Lease."

In May 2015, Jazz informed Uptown that it anticipated not being able to complete the sound mitigation work by the agreed-upon completion date of September 30, 2015, and requested an extension of time to complete the work. To accommodate that request, Uptown and Jazz entered into an eighth amendment to the Lease (the Eighth Lease Amendment) which extended the deadline for completing the sound mitigation work to June 30, 2016.

By February 2016 Jazz had informed Uptown that the sound mitigation work was completed in compliance with the Seventh Lease Amendment and the Eighth Lease Amendment. By letter dated December 19, 2016, Uptown's then-counsel notified

8

Jazz that, according to Uptown, Jazz was not in compliance with the maximum noise levels permitted by the Lease and the Seventh and Eighth Lease Amendment. The letter states the NBMC "provides different allowable noise levels based on the use of the property." The measurement location, counsel claimed, was on a boundary between two different noise zones and, therefore the lower noise standard (noise zone I) for multiple-family residential properties governed. Counsel claimed that noise levels measured by Uptown's consultant exceeded those permitted for noise zone I and by Mitigation Measure 10-3.

Jazz's counsel responded by letter dated February 1, 2017. Jazz's counsel contended the Leased Premises were not subject to noise zone I standards because under the Land Uses, Development Standard & Procedures and the Phasing Plan, and the Uptown Newport Planned Community Development Plan, Jazz was permitted to continue its operations as if it were in a noise zone IV as a noncomforming use. In addition, Jazz's counsel asserted that noise levels at the Leased Premised met the standards of Mitigation Measure 10-3, and those standards controlled over those of the NBMC.

PROCEDURAL HISTORY

I. *Uptown's Complaint for Declaratory Relief and Jazz's Cross-complaint*

Uptown filed its complaint against Jazz in February 2018 and filed a first amended complaint (Uptown's Complaint) the following month. Uptown's Complaint alleged that "from 2016 to the present the noise levels generated by [Jazz]'s activities within the Leased Premises have exceeded the noise levels permitted under the Lease" and that Jazz "did not perform all of the measures required to complete the Sound Mitigation [W]ork by the June 30, 2016, deadline." Uptown's Complaint alleged that Jazz breached the Lease by failing to do the following: (1) meet the 60 dBA Leq daytime standard under the NBMC; (2) meet the 50 dBA Leq nighttime standard; (3) meet the 65 dBA CNEL noise standard under Mitigation Measure 10-3; (4) perform sound mitigation

9

measures specified in Mitigation Measure 10-3 as necessary to meet its noise standards; (5) conduct annual noise measurements required under the sound mitigation agreement; and (6) comply with its obligation to ensure that exterior noise levels generated by Jazz's activities do not exceed 65 dBA.

The only cause of action asserted in Uptown's Complaint is for declaratory relief. Uptown seeks a declaration that Jazz failed to perform the Sound Mitigation Work set forth in the Seventh Lease Amendment (as modified by the Eighth Lease Amendment), such failure to perform constitutes a material breach of the Lease, and since June 30, 2016, Jazz has been obligated not to permit noise levels to exceed the maximum noise levels permitted by the sound mitigation agreement, the NBMC, and Mitigation Measure 10-3.

Jazz brought a special motion to strike Uptown's Complaint pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute. The respondent court denied the motion. In a nonpublished opinion, a panel of this Court affirmed the order denying Jazz's anti-SLAPP motion. (*Uptown Newport Jamboree, LLC v. Newport Fab, LLC* (Apr. 5, 2019, G056414).)

In July 2019, Jazz filed a cross-complaint against Uptown for fraud, negligent misrepresentation, and breach of the implied covenant of good faith and fair dealing. Jazz alleged that Uptown had fraudulently induced it to enter into the Seventh Lease Amendment, falsely approved Jazz's sound mitigation plans to meet 65 dBA Leq, and concealed its fraudulent intent "to assert that sound levels appearing nowhere in the [Seventh Lease] Amendment actually applied to Jazz until after the performance deadline had passed."

II. *Jazz's Motion for Summary Judgment*

In November 2020, Jazz filed a motion for summary judgment on Uptown's declaratory relief cause of action. In the memorandum of points and

10

authorities in support of the motion for summary judgment, Jazz asserted, "Fundamentally, what sound levels are 'applicable' to Jazz under the Amendment is a question of law that the Court may decide on a motion for summary judgment." In the memorandum of points and authorities in opposition to the motion for summary judgment, Uptown asserted, "Jazz has been and remains in chronic violation of applicable sound standards whether measured against those specific to the lease or the municipal code" and "[t]here is no question that Jazz is violating the NBMC, and by extension breaching the Seventh [Lease] Amendment."

The respondent court denied Jazz's motion for summary judgment. The court's order states, "Here, the parties' filings appear to show there are genuine differences of opinion about the technical standards, their application, and compliance, depending on the professional who is examining it. [Citations.] Such conflicting opinions would also appear to illustrate the presence of triable issues in the case."

## III. *Uptown's Motion to Trifurcate*

In March 2022, Uptown filed a motion in limine asking the court to try Uptown's declaratory relief cause of action first, before a jury trial on any remaining claims and issues. Jazz opposed the motion on the ground, among others, that the motion in limine was actually an untimely motion to bifurcate.

After trial was reset to June 6, 2022, Uptown brought a formal motion to trifurcate trial into three phases: (1) a bench trial on Uptown's declaratory relief cause of action; (2) a jury trial on Jazz's cross-complaint, and (3) a trial on punitive damages, if applicable. Uptown argued that trying its declaratory relief cause action first was warranted because declaratory relief is equitable and "[t]he issues are legal, predominately what standard applies to noise from Jazz emanating onto the Uptown [D]evelopment." Jazz argued in opposition that (1) Uptown's declaratory relief cause of action was "a contract-based action," (2) Uptown was judicially estopped from seeking

11

bifurcation by the respondent court's denial of Jazz's motion for summary judgment, and (3) Uptown's motion to trifurcate was in essence a motion for reconsideration of a decision made at a status conference in August 2019.

After hearing argument on June 7, 2022, the respondent court granted the motion to trifurcate. During the course of the hearing, the court made comments suggesting the scope of the first phase trial would be limited to interpreting the Seventh Lease Amendment. In explaining its tentative ruling, the court stated that Uptown was "asking me basically to declare what's the meaning of the contract," which is "a judicial function" and the respondent court would first "determine what does the contract provide for in terms of a standard of sound attenuation for the Leased Premises." After making its ruling, the respondent court confirmed it intended to try the "what-sound-standard-applies portion of the declaratory relief" and could rule on what that sound standard is.[1]

The respondent court issued a minute order granting the motion to trifurcate and bifurcating the declaratory relief cause of actions. Uptown prepared and served a notice of ruling which stated the court had ruled, "Uptown's claim for Declaratory Relief be trifurcated and the issue of what sound limit applies to noise from Jazz under the Lease and all amendments be tried first to the Court." Jazz objected to Uptown's notice of ruling as not accurately or completely reflecting the court's order. Jazz prepared and submitted a proposed order stating, "this Court finds the motion to trifurcate should be granted in the manner and for the reasons articulated at the hearing as reflected in the Reporter's Transcript attached hereto as Exhibit A." The respondent court signed Jazz's proposed order and it was entered as the order of the court on June 13, 2022.

Neither Uptown nor Jazz included the court's minute order or the signed order in the exhibits presented in connection with these writ proceedings. Neither

---

[1] The respondent court certified its ruling for interlocutory review pursuant to Code of Civil Procedure section 166.1.

12

Uptown nor Jazz even so much as mentioned the minute order or the signed order in the writ petition, informal responses and replies, formal return, or formal traverse. Jazz had an obligation to include the signed order in the record presented to us because a writ petition that seeks review of a trial court ruling must be accompanied by a record that includes "[t]he ruling from which the petition seeks relief." (Cal. Rules of Court, rule 8.486(b)(1)(A).) On our own motion, we take judicial notice of the minute order dated June 7, 2022, and the formal order signed by the court and entered on June 13, 2022. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

IV. *Jazz's Petition for Writ of Mandate*

Jazz filed a petition for writ of mandate to overturn the respondent court's order granting Uptown's motion for trifurcation. In the writ petition, Jazz asserted the respondent court had ordered a bifurcation of Uptown's entire declaratory relief action and had erred in doing so because "Uptown's declaratory relief is in effect a cause of action for breach of contract" and the order "wrongfully deprives Jazz of its constitutional right to a jury trial."

After receiving an informal opposition from Uptown and an informal reply from Jazz, we issued an order to show cause. Uptown submitted a return which, as we have explained, did not formally answer or demur to the allegations of Jazz's petition. Jazz submitted a traverse.

DISCUSSION

I. *General Principles of Review by Petition for Writ of Mandate*

Relief by writ of mandate is appropriate to correct a trial court order that constitutes an abuse of discretion. (*Bab v. Superior Court* (1971) 3 Cal.3d 841, 851; *Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 299.) "Although it is well established that mandamus cannot be issued to control a court's

13

discretion, in unusual circumstances the writ will lie where, under the facts, that discretion can be exercised in only one way." (*Bab*, at p. 851.) Two conditions prerequisite to the issuance of a writ of mandate are (1) the petitioner has no adequate remedy at law and (2) the petitioner will suffer irreparable harm if a writ is not issued. (*Los Angeles Gay & Lesbian Center*, at pp. 299-300; see *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1274.)

Our issuance of an order to show cause was, in effect, a determination that Jazz had no adequate remedy at law. (*Bounds v. Superior Court* (2014) 229 Cal.App.4th 468, 476-477; *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056.) Improper denial of a constitutional right to a jury trial is deemed to be prejudicial per se; a petitioner need not show actual prejudice. (*Mackovska v. Viewcrest Road Properties LLC* (2019) 40 Cal.App.5th 1, 13; *Byram v. Superior Court* (1977) 74 Cal.App.3d 648, 654.)

Our opinion therefore is limited to the issue of whether the respondent court abused its discretion by granting Uptown's motion to trifurcate. The test for abuse of discretion is traditionally recited as to whether the trial court's decision exceeded the bounds of reason. (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.) In more practical terms, the abuse of discretion standard measures whether, in light of the evidence, the lower court's decision falls within the permissible range of options set by the legal criteria. (*Bank of America, N.A. v. Superior Court*, *supra*, 212 Cal.App.4th at p. 1089.) The scope of the court's discretion is limited by law governing the subject of the action taken, and an action that transgresses the bounds of the applicable legal principles is deemed an abuse of discretion. (*Ibid.*) A trial court's decision is an abuse of discretion if it is based on an error of law (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 629) or if the court's factual findings are not supported by substantial evidence (*Millview County Water Dist. v. State Water Resources Control Bd.* (2016) 4 Cal.App.5th 759, 769).

Here, the trial court's discretion was limited by the law governing Jazz's constitutional right to a jury trial of Uptown's declaratory relief cause of action. Article I, section 16 of the California Constitution protects the right to a jury trial of a civil action that would have been tried to a jury at common law. (See *Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 853.) If the respondent court's order granting Uptown's motion to trifurcate denied Jazz a jury trial on issues for which Jazz was entitled to trial by jury, then issuance of a writ of mandate would be necessary and appropriate to correct the respondent court's error. (*Shaw v. Superior Court* (2017) 2 Cal.5th 983, 987, 993-994.

II. *The Scope and Meaning of the Order Granting Uptown's Motion to Trifurcate*

In deciding whether the respondent court erred by granting Uptown's motion to trifurcate, our first task is to determine what the respondent court actually ordered. Uptown and Jazz bitterly disagree on this point. Jazz's position is the respondent court misconstrued Uptown's declaratory relief cause of action as being limited to a determination of the applicable noise level limits and ordered a severance of the entirety of that cause of action. Uptown's position is the respondent court ordered a severance only of the issue of which noise level limits are imposed on Jazz's occupancy and the Leased Premises by the Lease, the Seventh Amendment to the Lease, and the NBMC. We agree with Uptown's construction of the respondent court's order, which is borne out by the court's statements made at the hearing on the motion to trifurcate.

The transcript of the hearing on the motion to trifurcate was attached as an exhibit to the formal order signed by the court and entered on June 13, 2022. That order states, "this Court finds the motion to trifurcate should be granted in the manner and for the reasons articulated at the hearing as reflected in the Reporter's Transcript attached hereto as Exhibit A." The respondent court's statements and comments made during the hearing on the motion to trifurcate therefore reflect respondent court's reasons and the scope of the order.

15

"A court order is interpreted under the same rules for interpreting writings in general. [Citations.] The language of a writing governs if it is clear and explicit. But when it is susceptible 'to two interpretations, the court should give the construction that will make the [writing] lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the [writing] extraordinary, harsh, unjust, inequitable or which would result in absurdity.'" (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 989.) "If an order is ambiguous, the reviewing court may examine the record for its scope and effect and may look at the circumstances of its making." (*In re Marriage of Samson* (2011) 197 Cal.App.4th 23, 27.) We apply these principles to the formal order signed by the court, which includes the transcript of the hearing on the motion to trifurcate.

Uptown's motion to trifurcate did indeed ask the court to sever the entire declaratory relief cause of action and try it first. The motion plainly stated that "[t]rial should be trifurcated to try Uptown's claim for declaratory relief" and "[t]rial in this matter would be greatly simplified and made more efficient by trying the declaratory relief claim to the Court first." A panel of this court concluded, "Uptown's complaint for declaratory relief is in effect a claim for breach of contract." (*Uptown Newport Jamboree, LLC v. Newport Fab, LLC, supra*, G056414.) Uptown sought a declaration that Jazz's failure to perform the sound mitigation work constituted a material breach of the Lease: The declaratory relief cause of action was "in effect used as a substitute for an action at law for breach of contract." (*Patterson v. Insurance Co. of North America* (1970) 6 Cal.App.3d 310, 315.)

But the respondent court's remarks at the hearing demonstrate that the court only severed issues pertaining to lease and statutory interpretation. The court, after hearing argument from counsel, stated it could not try the issue of whether Jazz had breached the Lease. The court made the comment: "I'm just being asked to determine the standard pursuant to looking at the Lease, Amendment 7 and Amendment 8. That's

16

really what it gets down to. That is statutory interpretation." The core question, the court stated, was "to determine what is the sound attenuation standard that applied to Jazz in the maintenance of its tenancy at these premises." That core question was not for the jury to decide; "[t]he question would be for the jury, whatever the standard is, was it breached?" The court expressed its understanding of the scope of the motion to trifurcate with these words: "[T]hey are asking me basically to declare what's the meaning of the contract. The sounds like a judicial function."

The court announced its tentative ruling was to grant the motion to trifurcate "but to limit the effect" to severing the issue of "what does the contract provide in terms of a standard sound attenuation for the Leased Premised?" After hearing further argument from counsel, the court granted the motion to trifurcate.

In making its ruling, the respondent court stated, "As far as the declaratory relief, the court believes that should be also bifurcated before the jury trial in this matter." Although this language appears to support Jazz's position, it must be read in light of the court's earlier comments, which establish the court believed the declaratory relief action did not encompass issues of breach.

Jazz places much emphasis on comments made by the respondent court suggesting the court misunderstood the declaratory relief cause of action as not concerning breach of contract. The court stated the declaratory relief cause of action "isn't a breach of contract action" sought "just to determine what is the sound attenuation standard that applies to Jazz in the maintenance of its tenancy at these premises," and was simply "a prelude to another lawsuit which would be for breach of lease." The respondent court's comments about the nature of the declaratory relief cause of action, though mistaken, support the proposition that the respondent court ordered a severance only of the issues of what noise level limits are imposed by the Lease, the Seventh Lease Amendment, and the NBMC. Because the respondent court believed the declaratory relief cause of action was limited to lease interpretation issues, the respondent court's

17

intent in granting Uptown's motion to trifurcate would be to sever and first try only those issues.

Uptown's notice of ruling was consistent with the respondent court's comments made at the hearing. The notice of ruling stated the court had ordered "Uptown's claim for Declaratory Relief be trifurcated and the issue of what sound limit applies to noise from Jazz under the Lease and all amendments be tried first to the Court."

We therefore conclude that by granting Uptown's motion to trifurcate, the respondent court ordered to be severed and tried first only the issue of determining the noise level limits imposed on the Leased Premises and Jazz's operation of the TowerJazz facility by the Lease, the Seventh Lease Amendment, the sound mitigation agreement, the NBMC, and Mitigation Measure 10-3. Other issues, such as breach and compliance with the applicable NBMC noise level limits, are not to be tried during the first phase of trial. This construction makes the order "'lawful, operative, definite, reasonable and capable of being carried into effect'" and avoids making the order "'extraordinary, harsh, unjust, [or] inequitable . . . .'" (*In re Marriage of Falcone & Fyke, supra*, 203 Cal.App.4th at p. 989.)

III. *The Respondent Court Had Authority to Sever Issues of Law and to Try Them First*

Uptown's declaratory relief cause of action is in effect an action for breach of contract, and breach of contract is a legal action for which Jazz would be entitled to a jury trial. (See *Entin v. Superior Court* (2012) 208 Cal.App.4th 770, 781; *Ceriale v. Superior Court* (1996) 48 Cal.App.4th 1629, 1634 ["There is a jury trial right on the contract breach cause of action"].) But the right to a jury trial extends only to issues of fact. (*Shaw v. Superior Court, supra*, 2 Cal.5th at p. 993.) Jazz is not entitled to a jury trial for resolution of issues of law: Those must be decided by the court. (*Ibid.*)

18

Several sections of the Code of Civil Procedure and the Evidence Code provide authority for the respondent court's power to sever issues of law and try them before conducting a jury trial on questions of fact. Code of Civil Procedure section 591 states: "An issue of law must be tried by the court." Evidence Code section 310, subdivision (a) states: "All questions of law (*including but not limited to questions concerning the construction of statutes and other writings*, the admissibility of evidence, and other rules of evidence) are to be decided by the court." (Italics added.)

Code of Civil Procedure section 598 grants the trial court the power to sever issues: "The court may, when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby, on motion of a party, after notice and hearing, make an order . . . that the trial of any issue or any part thereof shall precede the trial of any other issue or any part thereof in the case, except for special defenses which may be tried first pursuant to Sections 597 and 597.5." (*Ibid.*) It is within the trial court's discretion to order a severance and conduct separate trials. (*Omaha Indemnity Co. v. Superior Court, supra*, 209 Cal.App.3d at p. 1271.)

Code of Civil Procedure section 1048, subdivision (b) also grants the trial court the power to order a separate trial of a cause of action or issue: "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any cause of action, including a cause of action asserted in a cross-complaint, *or of any separate issue* or of any number of causes of action or issues, preserving the right of trial by jury required by the Constitution or a statute of this state or of the United States." (*Ibid.*, italics added.)

When a case presents both issues of law and fact, issues of law must be decided first: "In actions for the recovery of specific, real, or personal property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury, unless a jury trial is waived, or a reference is ordered, as provided in this code. *Where in these cases there*

*are issues both of law and fact, the issue of law must be first disposed of.* In other cases, issues of fact must be tried by the court, subject to its power to order any such issue to be tried by a jury, or to be referred to a referee, as provided in this code." (Code Civ. Proc., § 592, italics added.) Section 592 codifies the right to jury trial as it existed at common law. (*Shaw v. Superior Court, supra*, 2 Cal.5th at p. 994, fn. 9.)

IV. *Interpretation of the Lease, Lease Amendments, and Noise Level Provisions of the NBMC is an Issue of Law*

A. *Contract Interpretation Is an Issue of Law*

Interpreting the Lease and the Seventh Lease Amendment is necessary to determine the sound limitations and standards apply to the Leased Premises and Jazz's operation of the TowerJazz. Recital C of the Seventh Amended provides that Jazz agreed to implement sound mitigation measures that would make the loudness of sounds generated from the Leased Premises "to be fully compliant with all applicable Maximum Permitted Noise Levels, but in all events so that the exterior noise levels do not exceed 65 decibels (A-weighted)." Uptown contends this provision means noise generated at the Leased Premises must comply with the sound mitigation agreement, the NBMC, *and* Mitigation Measure 10-3.[2] Jazz contends this provision means exterior noise levels are compliant so long as they do not exceed 65 decibels. Which contention is correct is a matter of contract interpretation.

Interpretation of a contract is a legal question unless interpretation turns on resolution of conflicts in extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965)

---

[2] Uptown also alleged that Jazz "did not evaluate compliance" with the sound mitigation agreement and Jazz did not "[c]onduct annual noise measurements as required under the Sound Mitigation Agreement." Recorded restrictions such as the sound mitigation agreement are interpreted according to principles of contract interpretation. (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 380-381.)

62 Cal.2d 861, 865 ["Since there is no conflict in the extrinsic evidence in the present case we must make an independent determination of the meaning of the contract"]; *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 ["It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence"].)

Whether contract language is ambiguous is a question of law to be decided by the court. (*Joseph v. City of Atwater* (2022) 74 Cal.App.5th 974, 982.) Contract interpretation may be decided by a jury only if interpretation requires resolution of conflicts in admissible extrinsic evidence. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 ["When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law"].)

Jazz argues the respondent court necessarily found the Seventh Lease Amendment to be ambiguous by overruling objections to extrinsic evidence offered by Uptown in opposition to Jazz's motion for summary judgment. But if that were the case, interpreting the Seventh Lease Amendment would remain a legal issue because juries do not resolve ambiguities in a contract. "If the contract is capable of more than one reasonable interpretation, it is ambiguous [citations], and it is the *court's task* to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect to the mutual intention of the parties." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798, italics added; see *Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 284 ["[T]he interpretation of contract provisions is . . . a legal issue subject to de novo review, unless the contract is ambiguous and its interpretation turns upon the credibility of witnesses or the resolution of factual disputes"].)

Jazz has not identified any conflicts in the extrinsic evidence relevant to interpreting the Lease or any of its amendments. In opposition to Jazz's motion for

21

summary judgment, Uptown submitted evidence of the negotiations leading to the Seventh Lease Amendment and drafts of that amendment. Uptown's prior use of extrinsic evidence does not in itself entitle Jazz to a jury trial on the issue of contract interpretation. A jury trial is required only to assess credibility and resolve conflicts in extrinsic evidence upon which contract interpretation depends. (See *City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 ["the jury may interpret an agreement when construction turns on the credibility of extrinsic evidence"].)

### B. *Statutory Interpretation Is an Issue of Law*

Uptown alleged that Jazz breached the Lease by failing to comply with the sound level limitations imposed by the NBMC and to meet the noise standards of Mitigation Measure 10-3. The issue of what sound level limitations are imposed by the NBMC and Mitigation Measure 10-3 is a matter of statutory interpretation.

Interpretation of a statute is a question of law. (*Segal v. ASICS America Corp.* (2022) 12 Cal.5th 651, 662.) "It is a court's duty and responsibility to determine the meaning and scope of statutory language that is ambiguous." (*Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995, 1004.) The principles of statutory construction apply equally to the construction of ordinances. (*Russ Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839, 847, fn. 8; see *Boshernitsan v. Bach* (2021) 61 Cal.App.5th 883, 890.)

Application of a statute to a given set of facts is also a question of law when the facts are not in dispute. (*Estate of Madison* (1945) 26 Cal.2d 453, 456; see *In re Marriage of Martin* (2019) 32 Cal.App.5th 1195, 1199; *Wilson v. Brawn of California, Inc.* (2005) 132 Cal.App.4th 549, 554 ["Questions of law, such as statutory interpretation or the application of a statutory standard to undisputed facts, are reviewed de novo"].) Thus, application of a statute or municipal ordinance to a set of facts is a question for a

jury only if the facts are in dispute; in that situation, the jury must resolve the disputed factual issues.

As a consequence, the respondent court may — and must— decide as a matter of law the issue of what sound level limitations are imposed by the NBMC and Mitigation Measure 10-3. Jazz argues that in order to determine which noise zones and sound level limitations apply to the TowerJazz facility and the Uptown Development when Uptown declared the breach of the Lease, "the trier of fact will have to make multiple factual determinations . . . ." During the first phase of trial, the respondent court should identify any legitimate and material factual disputes regarding application of the NBMC and Mitigation Measure 10-3 and reserve those disputes for decision by a jury.[3] Jazz has a right to a jury trial only for resolution of disputed factual issues; if the facts are not in material dispute, then application of the NBMC and Mitigation Measure 10-3 is a question of law for the respondent court to resolve.

V. *The Order Granting Uptown's Motion to Trifurcate is Consistent with the Order Denying Jazz's Motion for Summary Judgment*

The respondent court's order denying Jazz's motion for summary judgment looms large in this writ proceeding. Jazz argues that by denying its motion for summary judgment, the respondent court concluded that the determination of applicable noise level limitations raised factual issues, for which Jazz is entitled to a jury trial. Uptown argues Jazz did not raise the issue of noise levels in its summary judgment motion and the

---

[3] Jazz argues that "even Uptown's experts agree that determining the applicable sound standard would require resolution of factual issues. However, "[a]n expert witness may not properly testify on questions of law or the interpretation of a statute." (*Communications Satellite Corp. v. Franchise Tax Bd.* (1984) 156 Cal.App.3d 726, 747; see *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 67 [an expert "may not state interpretations of the law, whether it be of a statute, ordinance or safety regulation promulgated pursuant to a statute"].) "'The manner in which the law should apply to particular facts is a legal question and is not subject to expert opinion.'" (*Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841.)

23

respondent court denied the motion because it found disputed factual issues only as to breach. Jazz claims Uptown had taken inconsistent positions and misrepresents the record; Uptown claims Jazz mischaracterizes its own summary judgment motion and misrepresents the summary judgment proceedings. Both Jazz and Uptown accuse the other of misinterpreting the respondent court's order denying Jazz's motion for summary judgment.

We conclude, based on an independent review of the summary judgment proceedings, that the respondent court's order granting Uptown's motion to trifurcate is consistent with the court's prior order denying Jazz's motion for summary judgment.

Our review of the meaning and effect of the order denying Jazz's motion for summary judgment starts with the notice of motion itself. We observe that in the notice Jazz did not ask the court to determine the applicable noise level standards under the Lease. Jazz moved for summary judgment on Uptown's declaratory relief cause of action on the following four grounds: (1) there was no triable issue of material fact that Jazz performed its sound mitigation work obligations by the deadlines set by the Lease; (2) Uptown's declaratory relief cause of action would require the respondent court to interpret the Lease in a manner that would result in a forfeiture; (3) there was no triable issue of material fact that the declaratory relief cause of action was barred by equitable estoppel; and (4) there was no triable issue of material fact that Uptown's claim was not appropriate for declaratory relief because Uptown did not own the property adjacent to the Leased Premises. Those are the only four grounds identified in the notice of motion.

In the memorandum of points and authorities in support of the motion for summary judgment, Jazz asserted the determination of what noise level standards applied could be decided as a matter of law. At page 1, Jazz argued, "This case presents a straightforward application of contract law to undisputed facts." At page 8 of the memorandum Jazz argued, "Fundamentally, what sound levels are 'applicable' to Jazz under the Amendment is a question of law that the Court may decide on a motion for

24

summary judgment." Those arguments, we note, are inconsistent with assertions made by Jazz in its petition for writ of mandate.

In the return, Uptown asserts it "never took the position that factual issues precluded Respondent Court from deciding the applicable noise limit as a matter of law" and "Uptown never took the position that Respondent Court could not decide the noise standard as a matter of law." Jazz claims those assertions are false and that Uptown argued in opposition to the motion for summary judgment that the issue of applicable noise level limits was subject to factual dispute. Jazz's argument is based entirely on the following statement made by Uptown's counsel at the hearing on the summary judgment motion: "The two principal issues are the standards and whether or not they're violating those standards, and those are highly disputed. . . . But this is simply not an appropriate matter for summary judgment when pretty much every major issue in this case is subject to factual dispute."

In its opposition papers, Uptown did not take the position there were triable issues of material fact regarding the correct interpretation of the Lease, the Seventh Lease Amendment, or the NBMC. Instead, Uptown asserted the motion for summary judgment was premised on an incorrect interpretation of the Seventh Lease Amendment i.e., that Jazz need only comply with one of the noise restrictions. Uptown argued Jazz was required to comply with all three noise restrictions set forth in the Seventh Lease Amendment, which included those imposed by the NBMC. Uptown argued the Leased Premises was subject to zone III as a matter of law and it was undisputed that Jazz was in violation of the noise standards of Mitigation Measure 10-3. Uptown asserted that "Jazz has been and remains in chronic violation of applicable sound standards whether measured against those specific to the lease or the municipal code" and "[t]here is no question that Jazz is violating the NBMC, and by extension breaching the Seventh [Lease] Amendment."

25

The respondent court did not rely on oral statements made by Uptown's counsel during the hearing but denied the motion for summary judgment because "the opposition *paper*[*s*] demonstrate there are reasonable disputes regarding multiple material facts." (Italics added.) Because the respondent court did not rely on oral argument by Uptown's counsel, judicial estoppel would not apply even were we to conclude counsel took inconsistent positions. (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.)

Jazz argues the order denying its motion for summary judgment definitively establishes the respondent court found triable issues of fact on the matter of contract and statutory interpretation. Jazz relies on the following passage from that order: "Here, the parties' filings appear to show there are genuine differences of opinion about *the technical standards*, their application, and compliance, depending on the professional who is examining it. [Citations.] Such conflicting opinions would also appear to illustrate the presence of triable issues in the case." (Italics added.)

We do read the order that way. For one thing, as we have emphasized, contract interpretation and statutory interpretation are questions of law, not fact. Second, as we have explained above in footnote 3, an expert may not testify on questions of law, such as contract or statutory interpretation (see, e.g., *California Shoppers, Inc. v. Royal Globe Ins. Co., supra*, 175 Cal.App.3d at p. 67), nor may an expert opine on the application of the law to particular facts (*Downer v. Bramet, supra*, 152 Cal.App.3d at p. 841).

Further, the respondent court said nothing more than the parties' filings "*appear*" to demonstrate triable issues of material fact—hardly a decisive and definite finding. (Italics added.) What are important are material facts actually identified by the respondent court as supporting denial of the summary judgment motion. When denying a motion for summary judgment on the ground there is a triable issue as to at least one material fact, the court must "specify one or more material facts raised by the motion that

26

the court has determined there exists a triable controversy." (Code Civ. Proc., § 437c, subd. (g).) Here, the respondent court specified Fact Nos. 21, 22, 26, 27, and 28 from Jazz's separate statement as being genuinely disputed. Those facts were:

21. "Jazz relied on City guidance to ensure that it was 'fully compliant with all applicable standards under the NBMC and M[itigation Measure] 10-3.'"

22. "Rosalinh Ung,[4] a Planner in the Community Development Department, was the 'Project Planner' who had 'primary planning responsibility' for the [Uptown] Development and was publicly listed as the City contact for the [Uptown] Development, and attested that '[a]s a Planner, I was and am familiar with the planning and zoning conditions of the [Uptown] Development, including the City noise level limitations applicable to the [Uptown] Development.'"

26. "In June and July 2014, Jazz reached out to Rosalinh Ung for guidance as to the 'applicable' notice levels."

27. "The City confirmed to Jazz that its facility 'is considered [an NBMC Noise] Zone IV use . . . restricted to an exterior noise level of 70 dBA.'"

28. "The City has confirmed that M[itigation Measure] 10-3 'does not impose a 65 dBA CNEL requirement at the TowerJazz facility—that standard is applicable only to the developer of the new residential units' at 'the receptor sites, not at the TowerJazz facility.'"

---

[4] In its motion for summary judgment, Jazz submitted a declaration from Ung, who was a Newport Beach associate city planner, on the subject of noise level limitation standards applicable to Jazz. Ung stated in her declaration that she had informed Jazz that TowerJazz was considered to be a zone IV use under the NBMC and that Mitigation Measure 10-3 imposed a 65 dBA CNEL to the developer of the new residential units at "'the residential receptor sites, not at the Tower Jazz facility.'" Although Ung's qualifications and the import of her declaration testimony were intensely disputed, in this writ proceeding Jazz does not assert that at a future trial it will call Ung as a witness on the issue of applicable noise level limitations.

27

None of those facts raise triable issues regarding contract or statutory interpretation, nor could they since contract and statutory interpretation are questions of law. Assuming for the sake of argument that Ung was qualified to interpret the noise level limitations of the NBMC and Mitigation Measure 10-3 and had authority to speak on the City's behalf (matters which we do not address here), her testimony would not create factual issues for a jury to decide. Although a court should defer to a City's interpretation of a city ordinance under certain circumstances, the court ultimately must independently reach its own interpretation. (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 896, fn. 10; *Stolman v. City of Los Angeles* (2003) 114 Cal.App.4th 916, 928 ["court has the duty ""to state the true meaning of the statute finally and conclusively,"" notwithstanding the agency construction""]; *Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214 ["the "'final responsibility for the interpretation of the law rests with the courts""""].) Further, a city planner's interpretation of a municipal ordinance is irrelevant if the meaning of the ordinance is clear and unambiguous as a matter of law. (*McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252, 1266.)

VI. *The Respondent Court Did Not Err By Considering Judicial Efficiency*

The respondent court stated its decision was "somewhat molded by some of the efficiency matter we've been talking about." Jazz argues that the respondent court's severance order will not yield those efficiencies because Jazz's cause of action for breach of the implied covenant of good faith and fair dealing "will involve precisely the same witnesses and evidence regarding the negotiation history, formation, interpretation, and performance of the agreements at issue . . . ."

The respondent court's order all the more promotes efficiency precisely because Jazz has asserted a cause of action for breach of the implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing cannot

28

contradict the express terms of a contract. (*Carma Developer (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374.) Accordingly, interpreting the Lease and Seventh Lease Amendment to resolve the issue of what noise level limitations they impose will be necessary to determine the nature and limits of obligations imposed by the implied covenant.

In its traverse, Jazz contends the respondent court "sacrificed Jazz's right to a jury trial in the name of judicial 'efficiency' due to logistical difficulties imposed by the Covid-19 pandemic." Judicial efficiency would not be a proper consideration for ordering a bench trial on factual issues for which Jazz has a right to a jury trial. But judicial efficiency is a proper consideration for determining whether to exercise the court's discretion to sever and first try issues of law, such as contract and statutory interpretation, which are not subject to trial by jury. (See Code Civ. Proc., § 1048, subd. (b) ["The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of . . . any separate issue"].) Trying first those legal issues for which Jazz does not have a right to a jury trial would promote judicial efficiency and save precious time by narrowing issues and identifying in advance any issues which must be determined by a jury.

CONCLUSION AND DISPOSITION

During the first phase of trial the respondent court is to interpret the Lease, the Seventh Lease Amendment, the sound mitigation agreement, the NBMC, and Mitigation Measure 10-3 to determine noise level limits and sound mitigation requirements they impose to the extent that can be determined as a matter of law. Our opinion has identified the limited circumstances under which interpretation of a contract becomes a jury question. Interpretation of a statute or ordinance is always a question of law. Application of a statute or ordinance to a given set of undisputed facts likewise is a question of law unless those facts are materially in dispute. If during the first phase of

29

trial, relevant, admissible evidence is presented that creates material factual disputes, the respondent court can at that point identify any factual issues created by the evidence, withhold resolution of them, and submit those issues to the trier of fact in a later phase of trial.

The petition for writ of mandate is denied. Uptown shall recover costs incurred in these proceedings.

SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


MOTOIKE, J.